971 A.2d 1187

**William DOONER and Maureen Dooner, h/w, Appellants**

v.

**Ralph DiDONATO and Philadelphia Stock Exchange, Appellees.**

Supreme Court of Pennsylvania.

Argued Oct. 22, 2008.

Decided June 4, 2009.

Brian J. Grady, Grady & Falcione, L.L.P., Philadelphia, Richard T. Brown, for William Dooner and Maureen Dooner, appellants.

Angela Marie Heim, Thomas A. Kuzmick, Carl D. Buchholz, III, Rawle & Henderson, L.L.P., Philadelphia, for Philadelphia Stock Exchange, appellee.

W. Scott Magargee, IV, Cozen O'Connor, Philadelphia, for Ralph DiDonato, appellee.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY and GREENSPAN, JJ.

## OPINION

Justice TODD.

In this appeal by allowance, we consider whether the federal Securities and Exchange Act of 1934 ("Securities Exchange Act" or "Act")[1] preempts Pennsylvania state-law tort claims

---

1. 15 U.S.C. § 78a *et seq.*

arising from a stock trader's assault of another trader on the floor of the Philadelphia Stock Exchange ("PSX"). For the reasons stated below, we conclude the Securities Exchange Act does not preempt such state law claims against a national securities exchange such as PSX. Accordingly, we reverse the order of the Superior Court.

The facts underlying this appeal are straightforward. Appellee PSX is a national securities exchange and is registered with the Securities and Exchange Commission ("SEC") pursuant to the Securities Exchange Act. In 2002, Appellant William J. Dooner worked as a stock trader on the floor of PSX and was a member of that exchange. Appellee Ralph DiDonato was registered as an equity options trader, was also a member of PSX, and like Dooner, conducted business on the floor of PSX. Both Dooner and DiDonato traded on the Semiconductor Index of PSX.

On December 4, 2002, DiDonato reached the PSX trading floor prior to Dooner. DiDonato set up his computer, and left the immediate area. A few minutes later, Dooner arrived, moved DiDonato's computer, and proceeded to situate himself in the place where DiDonato had been located. Dooner evidently took these actions based on the practice in the work culture of PSX that if a spot was unattended, it was considered to be open.

Upon finding Dooner in his spot, DiDonato grabbed Dooner from behind, yanking him backwards and causing him to strike his head and his neck on the floor, which briefly rendered him unconscious. When Dooner regained consciousness, he complained of being disoriented, dizzy, and having a headache and pain in his back and neck. Robert Roth, Dooner's immediate supervisor, approached the men, and assessed Dooner's condition. Ultimately, Roth accompanied Dooner to the hospital where he was admitted and underwent a CAT scan and a MRI. Thereafter, Dooner left the hospital against medical advice when he received a telephone call from his distraught wife, Appellant Maureen Dooner, who had just learned that her father had been diagnosed with lung cancer and had six months to live.

Subsequently, Dooner was diagnosed with whiplash and a sprain. At the time of trial, Dooner was taking a muscle relaxant and prescription sleep medication. He also received epidural injections in his neck and a series of physical therapy sessions to relieve his pain. As a result of his injuries, Dooner was unable to return to his employment as a stock trader. He remained unemployed for a period of 10 months before he obtained a position as a roofing estimator for Home Depot at a significant reduction in income.

On June 1, 2004, Dooner and his wife brought a civil action against DiDonato, John Wallace (whom the Dooners mistakenly alleged was DiDonato's employer), and PSX, in the Court of Common Pleas of Philadelphia County. The Dooners' Second Amended Complaint ("Complaint") contained various counts alleging both negligent and intentional torts.[2] The trial court

2. Specifically, in the Complaint, filed October 21, 2004, the Dooners alleged in Count I (Negligent Supervision), that all defendants, including PSX, failed to maintain proper supervision of the premises, failed to properly train their agents on how to maintain secure and safe conditions, failed to maintain proper security for the premises, failed to protect Dooner from the acts of others which PSX knew or should have known were likely to occur, and failed to provide a safe environment. Count II (Assault and Battery) and Count III (Negligence) against only DiDonato, are not relevant for purposes of this appeal. In Count IV (untitled) of the Complaint, brought against John Wallace and PSX, the Dooners asserted Wallace and PSX placed Dooner in reasonable apprehension of physical injury, created an atmosphere in which DiDonato was enabled to cause offensive contact with Dooner, their conduct was a substantial contributing factor in bringing about Dooner's injuries, and they breached their duty to protect Dooner and insure a safe work environment. Furthermore, the Dooners alleged that PSX failed "to appropriately address the issues of pugilism," failed to properly supervise trading on their trading floor, failed to develop or implement "an appropriate monitoring system through market surveillance team which they hired and employed," failed to obtain and act appropriately upon information regarding previous physical altercation which occurred on their trading floor, failed to take steps to maintain a peaceable atmosphere on their trading floor, failed to take steps to minimize the likelihood of such an attack which occurred to Dooner, failed to provide proper supervision, oversight, direction, and control over their traders and their "market surveillance team," failed to supervise traders who are also business invitees, and failed to maintain appropriate staff capable of providing a peaceful and civil environment. In Counts V, VI, and VII, against all defendants, including PSX, the Dooners alleged all defendants intentionally and negligently inflicted emotional distress on Dooner and sought punitive damages. Finally, in Count

granted Wallace's motion for summary judgment and dismissed him from the case. Additionally, the trial court dismissed, *inter alia,* all claims for intentional torts and punitive damages against PSX.

Trial in this matter began on February 27, 2006; after a five day trial, on March 3, 2006, the jury found DiDonato, PSX, and Dooner all acted negligently. The jury assessed comparative negligence among the parties: DiDonato 30%, PSX 50%, and Dooner 20%. The jury awarded damages in the amount of $1,800,000 sustained by Dooner and $135,000 sustained by his wife. Thereafter, PSX filed a post-trial motion for judgment notwithstanding the verdict and/or for a new trial. Judge Nitza I. Quinones Alejandro denied the motion, rejecting PSX's contention that all state tort claims against it, as a national securities exchange, were preempted. *Dooner v. DiDonato,* 82 Pa. D. & C. 4th 492, 501–06 (2006).

PSX appealed, and, in an unpublished opinion, a three-judge panel of the Superior Court reversed. *Dooner v. DiDonato,* No. 1841 EDA 2006, 2007 WL 5019443, unpublished memorandum (Pa.Super. October 17, 2007). Contrary to the trial court, the Superior Court panel concluded that the Dooners' claims were preempted by federal securities law. Specifically, the Superior Court determined that the Securities Exchange Act evinced a congressional intent to regulate thoroughly the area of governance of national exchanges regarding the conduct of floor traders. The Superior Court pointed to PSX having floor officials and a disciplinary committee responsible for preventing, investigating, and sanctioning the conduct of traders who become hostile on the trading floor. According to the intermediate appellate court, Congress' delegation of authority to national exchanges such as PSX is so complete as to make reasonable the inference that Congress left no room for the states to supplement it. In making this determination, however, the Superior Court made clear that its holding was limited to floor traders and not members of the general public. The panel concluded that the Securities Exchange Act preempts "a

VIII, against all defendants, including PSX, the Dooners alleged a loss of consortium. Complaint at 10–20.

floor trader's negligence causes of action against a national exchange where those causes of action implicate the exchange's statutory authority to govern itself." *Id.* at 14. Therefore, the Superior Court found that PSX was entitled to judgment as a matter of law and vacated the judgment in favor of the Dooners and remanded for further proceedings.

The Dooners filed a petition for allowance of appeal, and we granted allocatur, limited to the issue: "Does the Securities Exchange Act of 1934 preempt Pennsylvania state-law claims arising from personal injuries sustained on a stock exchange floor by a securities industry employee?" *Dooner v. Philadelphia Stock Exch.*, 596 Pa. 502, 946 A.2d 640 (2008) (order).[3]

 Initially, we note this appeal reaches our Court through the trial court's denial of PSX's post-trial motion for judgment notwithstanding the verdict ("JNOV"). An appellate court will reverse a trial court's grant or denial of a JNOV only when the appellate court finds an abuse of discretion or an error of law. *Lockwood v. City of Pittsburgh*, 561 Pa. 515, 519, 751 A.2d 1136, 1138 (2000). Here, the question of whether federal securities law preempts the Dooners' state law tort claims is a question of law. Therefore our standard of review is *de novo* and our scope of review is plenary. *Stone Crushed P'ship v. Kassab Archbold Jackson & O'Brien*, 589 Pa. 296, 303 n. 5, 908 A.2d 875, 880 n. 5 (2006).

 To understand the legal issue raised in this appeal, it is useful to begin with a summary of the law of preemption. Simply stated, federal law is paramount. More specifically, Article VI, cl. 2, of the United States Constitution, the Supremacy Clause, provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, according to the United States Supreme Court, laws that are in conflict with

3. We have jurisdiction over this matter pursuant to 42 Pa.C.S.A. § 724 ("final orders of the Superior Court and final orders of the Commonwealth Court not appealable under section 723 (relating to appeals from Commonwealth Court) may be reviewed by the Supreme Court upon allowance of appeal").

federal law are "without effect." *Altria Group, Inc. v. Stephanie Good,* —— U.S. ——, ——, 129 S.Ct. 538, 543, 172 L.Ed.2d 398, —— (2008) (quoting *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)). Questions concerning the span of this constitutional matter of preemption, however, are not always easily answered. *See Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941).

In determining the breadth of a federal statute's preemptive effect on state law, we are guided by the tenet that "the purpose of Congress is the ultimate touchstone in every pre-emption case." *Wyeth v. Levine,* —— U.S. ——, ——, 129 S.Ct. 1187, 1194, 173 L.Ed.2d 51 (2009) (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)). Congress may demonstrate its intention in various ways. It may do so through express language in the statute (express preemption). Yet, even if a federal law contains an express preemption clause, the inquiry continues as to the substance and the scope of Congress' displacement of the state law. *Altria Group, Inc.,* 129 S.Ct. at 543.

In the absence of express preemptive language, Congress' intent to preempt all state law in a particular area may be inferred. This is the case where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation. That is to say, Congress intended federal law to occupy the entire legislative field (field preemption), blocking state efforts to regulate within that field. *English v. General Electric Co.,* 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990).

Finally, even where Congress has not completely displaced state regulation in a specific area, state law is nullified if there is a conflict between state and federal law (conflict preemption). *Freightliner Corp. v. Myrick,* 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995). Such a conflict may arise in two contexts. First, there may be conflict preemption where compliance with state and federal law is an impossibility. *English,* 496 U.S. at 79, 110 S.Ct. 2270. Furthermore, conflict preemption may also be found

when state law stands as an obstacle to the accomplishments and execution of the full purposes and objectives of Congress. *Barnett Bank of Marion County v. Nelson*, 517 U.S. 25, 31, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996).

Additionally, concepts of federalism and state sovereignty make clear that in discerning whether Congress intended to preempt state law, there is a presumption *against* preemption. *Altria Group, Inc.*, 129 S.Ct. at 543. Specifically, the United States Supreme Court has stated that "it will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so." *New York State Dep't of Social Servs. v. Dublino*, 413 U.S. 405, 413, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973) (quoting *Schwartz v. Texas*, 344 U.S. 199, 202–03, 73 S.Ct. 232, 97 L.Ed. 231 (1952)). Stated another way, a cornerstone of the United States Supreme Court's preemption jurisprudence is that, "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' . . . we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Wyeth*, 129 S.Ct at 1194–95 (quoting *Lohr*, 518 U.S. at 485, 116 S.Ct. 2240).

With these guiding principles in mind, we turn to the arguments of the parties. The Dooners, emphasizing the reluctance of federal courts to find the preemption of state law claims, contend that their claims, which are based upon assertions of negligent supervision and premises liability, are not preempted by the Securities Exchange Act because they have nothing to do with the underlying purpose of that statute—the regulation of investments and securities. The Dooners cite to United States Supreme Court precedent, reasoning that the Securities Exchange Act preempts only to the extent necessary to protect the aims of the Act. *Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Ware*, 414 U.S. 117, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973) (concluding that state statute for action for collection of unpaid wages in spite of agreement to arbitrate is

not preempted by the Securities Exchange Act). Thus, contrary to the Superior Court's conclusion, the Dooners contend their state law tort claims are not preempted by the Act, as these claims are in no way inconsistent with the underlying purpose of the federal statute. Moreover, the Dooners emphasize the Act does not expressly preempt state law claims and the savings clause broadly preserves state law rights and remedies. Finally, the Dooners offer a recent New York state intermediate court decision which found no preemption of a sexual harassment claim. *Lucarelli v. New York Mercantile Exch.*, 24 A.D.3d 117, 804 N.Y.S.2d 741 (2005). Thus, the Dooners maintain that their claims against PSX are not preempted by federal law.[4]

PSX counters that the Superior Court properly held that the Securities Exchange Act preempts the Dooners' state law tort claims against a national exchange such as PSX. According to PSX, to accomplish its purpose of regulating securities exchanges and markets, the Securities Exchange Act requires national exchanges such as PSX to self-regulate subject to the oversight, supervision, and control of the SEC. Consistent with this approach, national exchanges promulgate rules which are in turn approved or disapproved by the SEC through the exercise of its quasi-legislative grant of authority from Congress. PSX maintains this is a pervasive scheme of regulation that combines self-regulation by the securities exchanges with direct regulation by the SEC.

Sharpening the point, PSX develops that its rules regulate who is permitted on the exchange floors, the "order & deco-

---

**4.** Additionally, in a one-sentence assertion, the Dooners make the bald contention that PSX waived its preemption defense "by the stock exchange's answer admitting the force of 'state law' in its answer to the plaintiffs' second amended complaint." Dooner Brief at 7 (citing Answer of Defendants, Philadelphia Stock Exchange and John Wallace, To Plaintiffs' Second Amended Complaint With New Matter and New Matter Pursuant to Rule 2252(d) ("Answer") at ¶ 13 (R.R. 53a). First, due to the cursory nature of this claim, it is waived. Moreover, PSX, in paragraph 13 of its Answer, merely states that "traders['] behavior is controlled and regulated through federal and state law and their agreement to abide by the rules and regulations of [PSX]." Answer at ¶ 13 (R.R. 53a)). This clearly is not an admission that state tort claims are not preempted.

rum" of persons on the floor, and procedures for the sanctioning of members who breach these rules. The Dooners' state tort claims, according to PSX, impact the organization and operation of the trading floor, and thus, are preempted by federal law. Furthermore, PSX embraces the rationale offered by the Appellate Division of the Supreme Court of New York in *Bantum v. American Stock Exch., LLC*, 7 A.D.3d 551, 777 N.Y.S.2d 137 (2004), which found a claim of sexual harassment to be preempted by the Securities Exchange Act. Likening the Dooners' state law claims to the sexual harassment claim pursued in *Bantum*, PSX urges our adoption of the approach of the *Bantum* court finding preemption. Specifically, PSX asserts that permitting state law claims despite the Act's regulation of the securities marketplace, which combines self-regulation by the securities exchanges with oversight and direct regulation by the SEC, would stand as an obstacle to the accomplishment of the purposes and objectives of Congress. As PSX is governed by a comprehensive set of rules promulgated by PSX and approved by the SEC, the essence of PSX's self regulation would be eviscerated, contrary to the specific objectives and purposes of the Securities Exchange Act, if PSX could be held liable for damages because one member/trader assaults another member/trader over a particular post on the trading floor. In other words, PSX asserts it could not self-regulate itself if it was subject to the types of state law claims at issue *sub judice.* Thus, PSX urges us to find that the Dooners' state tort claims are implicitly preempted by the Securities Exchange Act and to affirm the decision of the Superior Court.

As Congress' intent is the touchstone of an analysis concerning preemption, we begin our consideration of the preemption issue by exploring such purpose. To fully analyze the question of Congressional intent, and whether there is an impermissible conflict between the federal securities regulatory scheme and state law tort claims, we will consider each type of preemption to discern whether Congress intended to preempt state-law tort claims such as those advanced by the Dooners.

 We first address express preemption. The language used by the legislature is the best indication of its intent. The "task of statutory construction must in the first instance focus on the plain wording of the [express preemption] clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Sprietsma v. Mercury Marine*, 537 U.S. 51, 62–63, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002) (internal quotation marks omitted). While the Securities Exchange Act speaks to certain areas of state law that shall not apply to securities,[5] a review of the statute makes it apparent that Congress did not expressly preempt state law tort claims. *See Silver v. New York Stock Exch.*, 373 U.S. 341, 357, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). This conclusion is made manifest by the Securities Exchange Act's savings clause. In Section 28(a) of the Act, 15 U.S.C. § 78bb, entitled "Effect on existing law," Congress spelled out in very specific terms what law and types of actions are preempted by the statute, broadly preserving state statutory and common law rights and remedies:

> Except as provided in subsection (f) [relating to remedies], **the rights and remedies provided by this title [15 U.S.C. § 78a *et seq.*] shall be in addition to any and all other rights and remedies that may exist at law or in equity;** but no person permitted to maintain a suit for damages under the provisions of this title shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of.

15 U.S.C. § 78bb(a) (emphasis added).[6]

This language is strong and sweeping. Based upon the lack of an express preemption clause and an expansive savings

**5.** For example, the Securities Exchange Act provides: "No State law which prohibits or regulates the making or promoting of wagering or gaming contracts, or the operation of 'bucket shops' or other similar or related activities, shall invalidate any put, call, straddle, option, privilege, or other security subject to this title, or apply to any activity which is incidental or related to the offer, purchase, sale, exercise, settlement, or closeout of any such security." 15 U.S.C. § 78bb(a).

**6.** The savings clause also preserves certain powers of state "blue sky" agencies by providing that "nothing in this title shall affect the jurisdic-

clause, we conclude Congress did not expressly preempt state law tort claims.[7] Thus, we find that the Dooners' claims are not expressly preempted. As the state law tort claims at issue in this appeal are not expressly preempted, any preemption of these claims must be discerned only as a matter of implication.

With respect to preemption by implication, we first consider whether the Securities Exchange Act preempts Dooners' state law claims through field preemption, i.e., "where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law." *Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 368, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986). In general, a determination that Congress intended, implicitly, to preempt state regulation of a given field must be based upon "an unambiguous congressional mandate to that effect." *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 147, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963). This is so due to the nature of federal law:

> Federal law is generally interstitial in its nature. **It rarely occupies a legal field completely, totally excluding all participation by the legal systems of the states.... [Federal legislation] builds upon legal relationships established by the states, altering or supplanting them only so far as necessary for the special purpose.** Congress acts, in short, against the background of the total corpus juris of the states in much the way that a state legislature acts against the background of the common law, assumed to govern unless changed by legislation.

tion of the securities commission (or any agency or officer performing like functions) of any State over any security or any person insofar as it does not conflict with the provisions of this title or the rules and regulations thereunder." *Id.*

7. *See* Facciolo and Stone, *Avoiding the Inevitable: The Continuing Viability of State Law Claims in the Face of Primary Jurisdiction and Preemption Challenges Under the Securities Exchange Act of 1934,* 1995 Colum. Bus. L.Rev. 525, 530 (1995) ("[s]tate law is rarely preempted pursuant to the Exchange Act because a clear intent to preempt state law cannot be found in the Exchange Act, which in fact expressly preserves the continued application of state law").

*State of North Dakota v. Merchants National Bank and Trust Co.*, 634 F.2d 368, 375 (8th Cir.1980) (citing P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *Hart & Wechsler's The Federal Courts and the Federal System*, 470–71 (2d ed. 1973)) (emphasis added).

In considering whether Congress implicitly intended to occupy the entire field of securities regulation to the exclusion of the states, we briefly look to the historical context of the enactment of the Securities Exchange Act as well as the federal scheme of securities regulation. Federal regulation of securities came about as a result of the stock market crash of 1929. Congress enacted the Securities Exchange Act, as well as the earlier Securities Act of 1933, 15 U.S.C. § 77p, as a complement to state law,[8] to regulate and control transactions in securities conducted in securities exchanges and over-the-counter markets and the practices and matters related thereto. 15 U.S.C. § 78b. Thus, even cursory consideration of the history of the Securities Exchange Act supports a state role in serving the broad underlying purposes of the statute.

Related thereto, the structure of the Securities Exchange Act itself suggests no preemption of the entire field of securities regulation as it recognizes state "blue sky" laws and, as noted above, contains a savings clause, which preserves rights and remedies in law and in equity. This savings clause strongly negates the suggestion of field preemption. In enacting the savings clause, Congress recognized the possibility of dual litigation in state and federal courts. *See Matsuchita Elec. Indus. Co. Ltd. v. Epstein*, 516 U.S. 367, 383, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996); *see also International Paper Co. v.*

**8.** *See* Szydlowski, *Preemption in the Securities Industry: A Diminished Standard?*, 74 St. John's L.Rev. 259, 265 n. 36 (2000) (quoting Manning Gilbert Warren III, *Legitimacy in the Securities Industry: The Role of Merit Regulation*, 53 Brook. L.Rev. 129, 132 (1987) ("[T]he states' role in providing investor protection was not a 'me too' response to federal regulation. When Congress adopted the 1933 Act, every state but Nevada had enacted blue-sky laws during the preceding twenty years. Because of an unprecedented deluge of worthless securities offerings in the 1920s and jurisdictional limitations on enforcement, state securities administrators asked Congress for a 'supplemental' federal law to fill the gap in their preexisting regulatory schemes.")).

*Ouellette,* 479 U.S. 481, 492–93, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987) ("Although Congress intended to dominate the field of pollution regulation, the savings clause negates the inference that Congress 'left no room' for state causes of action."). Indeed, to find field preemption would excise the savings clause from the statute.

Therefore, the structure of the federal scheme of regulation evinces a multifaceted and shared form of regulation involving direct federal regulation, direct state regulation, and claims in law and in equity. This scheme hardly suggests an "unambiguous congressional mandate" to inhabit the entire field of securities regulation. Thus, we conclude that Congress did not implicitly intend to occupy the entire field of securities regulation so comprehensively as to exclude all state regulation.[9]

 Finally, we turn to conflict preemption: whether state law tort claims are nullified because they conflict with federal law: "Even if Congress has not completely foreclosed state legislation in a particular area, [state law] is void to the extent that it actually conflicts with a valid federal statute." *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 158, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978). Such a conflict may arise in two contexts. First, as noted above, there may be conflict preemption where compliance with both state and federal law is an impossibility.

9. While PSX argues, and the Superior Court found, that PSX's authority over floor trader conduct is so complete as to leave no room for the states to supplement this discrete aspect of regulation, this approach seemingly reveals a misunderstanding of the concept of field preemption. Field preemption, as the moniker suggests, deals with Congress' inferred intent to preempt an entire field of law—here the field of securities regulation. It traditionally does not consider the preemption of some narrow and limited aspect of that field. PSX's assertion fits more comfortably under the rubric of conflict preemption, discussed below. We note, however, in *Shulick v. PaineWebber,* 554 Pa. 524, 722 A.2d 148 (1998), our Court seemingly engaged in a circumscribed field preemption analysis in finding a state common law action based on inadequate disclosure of payments received in the course of executing a brokerage transaction was preempted. This approach is contrary to the traditional field preemption jurisprudence which focuses upon occupation of the entire legislative field; *see, e.g., Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 229–30, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), thus, we limit such an approach to the *Shulick* decision.

*English,* 496 U.S. at 79, 110 S.Ct. 2270. Furthermore, conflict preemption may also be found when state law stands as an obstacle to the accomplishments and execution of the full purposes and objectives of Congress. *Barnett Bank of Marion County,* 517 U.S. at 31, 116 S.Ct. 1103; *Hines,* 312 U.S. at 67, 61 S.Ct. 399.

In considering conflict preemption, we focus on the scheme established by Congress to determine whether state tort law claims interfere with the functioning of that scheme. Therefore, we begin by examining the federal securities exchange regulatory scheme, and, in particular, self-regulation by national securities exchanges.

The congressional purpose in enacting the Securities Exchange Act was to protect interstate commerce, the public, and investors by prohibiting the manipulation of stock prices and stock transactions, and to insure the maintenance of fair and honest markets in such transactions. In furtherance of these purposes, Congress created two distinct aspects of federal regulation. Some provisions of the statute directly impose requirements and prohibitions, while other provisions rely upon exchange self-regulation. *See Silver,* 373 U.S. at 349–55, 83 S.Ct. 1246 (explaining securities regulatory scheme in context of finding Securities Exchange Act did not exempt stock exchanges from antitrust laws). Supervised self-regulation, "although consonant with the traditional private governance of exchanges, allows the Government to monitor exchange business in the public interest." *Ware,* 414 U.S. at 127–28, 94 S.Ct. 383.[10] Exchanges are registered with the SEC. 15 U.S.C. § 78f. Registration is conditioned upon a showing that exchanges have rules that are designed "to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, . . . and, in

10. As colorfully explained by United States Supreme Court Justice William O. Douglas, "This permits the exchanges to 'take the leadership with Government playing a residual role. Government would keep the shotgun, so to speak, behind the door, loaded, well oiled, cleaned, ready for use but with the hope it would never have to be used.'" *Id.* at 128, 94 S.Ct. 383 (quoting W. Douglas, *Democracy and Finance* 82 (J. Allen ed. 1940)).

general, to protect investors and the public interest." 15 U.S.C. § 78f(b)(5).

■ Thus, it becomes evident that the driving principle behind the regulatory scheme of self-regulation and, more specifically, national securities exchange rules concerning the disciplining of traders is "to insure fair dealing and to protect investors from harmful or unfair trading practices." *Ware*, 414 U.S. at 130, 94 S.Ct. 383. As contextualized by the *Ware* Court, any exchange rule or practice in contravention of this policy would be subject to federal supervision or action, but, "[c]orrespondingly, any rule or practice not germane to fair dealing or investor protection would not appear to fall under the shadow of the federal umbrella; it is, instead, subject to applicable state law." *Id.* at 130–31, 94 S.Ct. 383. With this understanding of self-regulation and exchange rules, we first consider whether compliance with both state and federal law is an impossibility.

The Dooners contend that PSX's rules and state law tort claims can co-exist. PSX, conversely, argues that to permit state law tort claims will "eviscerate" its rules and the concept of self-regulation. Specifically, PSX points to Membership Rule 707 "Just and Equitable Principles of Trade," which provides "[a] member, member organization, or person associated with or employed by a member or member organization shall not engage in conduct inconsistent with just and equitable principles of trade." PSX Exhibit 7 (R.R. 526a). Similarly, Membership Rule 708, "Acts Detrimental to the Interest or Welfare of the Exchange," states "[a] member, member organization, or person associated with or employed by a member or member organization shall not engage in acts detrimental to the interest or welfare of the Exchange." PSX Exhibit 8 (R.R. 527a). Related thereto, PSX notes that its by-laws provide for disciplinary rules governing the investigation and enforcement of violations of PSX's rules and regulations. Consistent therewith, PSX Rule 60, "Options Floor Procedure Advices and Order & Decorum Regulations—Sanctions for Breach of Regulations," provides that a floor official on the trading floor may impose sanctions against a member for

breaching the "regulations that relate to administration of order, decorum, health, safety and welfare on the Exchange." PSX Exhibit A to "Sur–Reply Memorandum of Law in Further Support of the Motion for Summary Judgment of Defendant Philadelphia Stock Exchange" (R.R. 133a). Furthermore, PSX offered testimony by James Holt, a professional security consultant, that it had various security measures in place, including criminal history checks, security cameras, guards and a uniformed police officer at the entrance of the building. N.T. Trial, 3/1/06, at 163–166 (R.R. 367a–371a). Additional testimony by Edward Deitzel established that a Market Surveillance Department responsible for "all member trading and compliance with trading rules," and floor officials addressed problems on the floor. N.T. Trial, 2/27/06, at 185 (R.R. 229.1a). Thus, according to PSX, self-regulation, subject to extensive oversight, supervision, and control by the SEC, would be completely negated if the Dooners were permitted to pursue their tort claims regarding the supervision of traders and the security measures employed by PSX.

While PSX emphasizes its disciplinary function and rules, as is evident from the above discussion, the primary focus of stock exchange discipline is on trader conduct as it relates to "just and equitable principles of trade" and to "protect investors and the public interest." 15 U.S.C. § 78f (b). Obviously, the assault of one trader by another is not the main focus of PSX's disciplinary rules. Moreover, even though PSX's rules may address trader safety, and violent trader conduct may result in disciplinary proceedings, state law tort claims based on assault and battery that allege negligent supervision and the negligent provision of a safe work environment would not in any way make such safety practices and disciplinary proceedings an impossibility or prevent PSX from disciplining its traders for misconduct. Indeed, in this matter, pursuant to these rules, floor officials barred DiDonato from the trading floor for the remainder of the day after the assault on Dooner, and, after disciplinary proceedings, DiDonato was suspended for a 10–day period and fined $15,000.

Therefore, we find that it is not impossible for state tort claims—arising from an assault and alleging negligent supervision and the negligent provision of a safe work environment—and PSX's rules regarding trader discipline and floor security to co-exist. As the United States Supreme Court forewarned in its most recent decision concerning preemption, "[i]mpossibility pre-emption is a demanding defense." *Wyeth*, 129 S.Ct. at 1199. As we discern no impossibility of state law and federal regulation co-existing with respect to the matter *sub judice*, we hold that Dooners' state law claims are not preempted by way of impossibility preemption.

Finally, as to the remaining aspect of conflict preemption, when a state law stands as an obstacle to the accomplishments and execution of the full purposes and objectives of Congress, such law will be of no effect. *Hines*, 312 U.S. at 67, 61 S.Ct. 399. The Dooners maintain that their state law claims are not an obstacle to effectuating the purposes of the Securities Exchange Act or PSX's rules. PSX responds that the Dooners' claims would stand as an obstacle to self-regulation of the securities industry and emphasizes that aspect of Dooners' claims that touch upon the placement of traders on the exchange floor. In support of its position, PSX cites *Bantum*, the New York intermediate appellate court decision which found a claim of sexual harassment to be preempted by the Securities Exchange Act.

Again, the core purpose of federal securities regulation with respect to disciplinary rules regarding trader conduct is fair dealing and investor protection. The relationship between state law tort claims arising from an assault and battery and this prime purpose is attenuated and, at best, peripheral to the thrust of the scheme of federal securities regulation.[11] While there may be some minor tension between claims such as negligent supervision and the negligent provision of a safe

11. This distinguishes this matter from other decisions in which preemption of state law tort claims have been found, as the state tort claims here are remote to the underlying purposes of the Securities Exchange Act and national securities rules. *See, e.g., Shulick, supra,* (holding state common law action based on disclosure of overflow payments received in course of executing brokerage transaction preempted).

workplace and the supervision and placement of traders in a fashion that minimizes workplace violence, that potential for interference is insufficient to counterbalance the legitimate and substantial interest of the Commonwealth in protecting the interests of its citizens. *See Farmer, Special Administrator v. United Brotherhood of Carpenters & Joiners of America, Local 25,* 430 U.S. 290, 304, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977).

Indeed, we would be wary to hold state tort law claims arising from assault to be preempted because of a conflict concerning an incidental aspect of the federal regulatory scheme. This is especially true here where the law that PSX argues is preempted is historically and traditionally a state law domain. Pennsylvania has a strong public policy of protecting individuals against physical harm and allowing damages for the breach of relevant duties—such long-standing policy should prevail absent any significant interference with the federal regulatory scheme. Simply stated, we do not believe that our Commonwealth's common law should be summarily dismissed by what we believe to be an overly broad assertion of obstruction of purpose. Our conclusions regarding Congress' intent do not produce anomalous results. Consistent with United States Supreme Court case law, it would be entirely rational for Congress not to preempt common law claims, which—unlike most administrative and legislative regulations—necessarily perform an important remedial role in compensating victims of torts. *Sprietsma,* 537 U.S. at 64, 123 S.Ct. 518; *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 251, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). This is especially true here, where the Securities Exchange Act provides no mechanism for providing damages for the victim of a tort. To find preemption in this context raises the specter of the victim of an assault and battery being left without recourse, or with only limited recourse to a damages remedy.

Furthermore, we do not find the decision in *Bantum* to be persuasive. In *Bantum,* a New York intermediate court of appeals was faced with the issue of whether the Securities Exchange Act preempted a broker's allegations of a hostile

work environment and sexual harassment under state and city discrimination laws. In a cursory analysis, the court concluded that allowing the state claims arising from the exchange's disciplinary functions would "clearly stand as an obstacle" to the scheme of self-regulation by exchanges with oversight and direct regulation by the SEC. *Bantum,* 777 N.Y.S.2d at 140 (internal quotation marks omitted). The court did not engage in any discussion regarding the purpose of the Securities Exchange Act in general, or the disciplinary rules promulgated thereunder.[12] As noted above, the primary purpose of the Securities Exchange Act is protection of the public and investors, and an exchange's disciplinary rules deal principally with the just and equitable principles of trading. Thus, we disagree with the approach and the conclusions reached by the court in *Bantum.*

In conclusion, we have noted the presumption against preemption, especially in traditional and historically entrenched state-dominated areas such as public safety and welfare; the absence of express language preempting state law tort claims in the Securities Exchange Act; and the broad savings clause preserving all state law rights and remedies. Furthermore, we have acknowledged the multifaceted system of regulation of securities, which refutes the suggestion that federal regulation is so comprehensive as to displace all state regulation and have recognized the concomitant lack of a clear and manifest purpose by Congress to preempt. Finally, we have explained the possibility of co-existence of federal law and state law in this area and the lack of any meaningful obstruction to the purposes of Congress in regulating securities and securities markets. Based upon these considerations, we hold the Securities Exchange Act, and the federal regulations and national securities exchange rules promulgated thereunder, do not

---

12. Nor does the New York intermediate appellate court's decision in *Lucarelli,* cited by the Dooners, fair any better. The court in *Lucarelli* simply concludes without discussion that because a claim of sexual harassment has "nothing to do with the purposes of" the Securities Exchange Act or the exchange's regulatory function, such claims are not preempted. *Lucarelli,* 804 N.Y.S.2d at 741–42. Thus, we find these two intermediate court decisions from New York to be of little assistance in our determination.

preempt state tort law claims such as those asserted by the Dooners—predicated on negligence and the duty to provide a safe work environment—arising as a result of a trader's physical assault of another trader.

Accordingly, the order of the Superior Court is reversed and the matter is remanded to the Superior Court for proceedings consistent with our decision today. Jurisdiction relinquished.

Chief Justice CASTILLE, Justices SAYLOR, EAKIN, BAER and McCAFFERY and Justice GREENSPAN join the opinion.