**David MILLER and I26 Hotel Corporation, Appellants**

v.

**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY.**

Commonwealth Court of Pennsylvania.

Argued May 16, 2012.

Decided March 7, 2013.

Robert F. Morris, Plymouth Meeting, for appellants.

Gaetan J. Alfano, Philadelphia, for appellee.

BEFORE: PELLEGRINI, President Judge, and McGINLEY, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and McCULLOUGH, Judge, and COVEY, Judge.

OPINION BY Judge LEAVITT.

David Miller and the hotel he owns (collectively, Miller) appeal an order of the Court of Common Pleas of Montgomery County (trial court) granting summary judgment to the Southeastern Pennsylvania Transportation Authority (SEPTA) on Miller's tort claim. Miller sought to hold SEPTA liable for water damage to his hotel. He claimed that a poorly maintained railroad bridge owned by SEPTA obstructed the flow of a stream, causing the stream to flood Miller's hotel. The trial court concluded that Miller's state common law negligence action was barred by federal law and, thus, entered judgment in favor of SEPTA. For the reasons that follow, we affirm.

In June 1996, Miller purchased a hotel, known as the Cherry Tree Hotel, in Fort Washington, Pennsylvania, that is located next to Sandy Run Creek. On three separate occasions, Sandy Run Creek flooded the hotel: in September 1996 during Hurricane Fran; in September 1999 during Tropical Storm Floyd; and in June 2001

during Tropical Storm Allison. Each storm resulted in flooding that filled the hotel's basement and first floor. In August 2001, the Cherry Tree Hotel closed and its owner, the I26 Hotel Corporation, declared bankruptcy.[1]

When Miller purchased the hotel, a nearby stone arch railroad bridge crossed Sandy Run Creek. This bridge was constructed in 1912 by the Philadelphia Reading Railroad and later acquired by SEPTA, which was created in 1963. In June 2001, as a result of Tropical Storm Allison, the 1912 railroad bridge collapsed, and SEPTA replaced it.

In September 2003, Miller filed a complaint against SEPTA[2] alleging that SEPTA had been negligent because it did not properly care for, repair, inspect and maintain the 1912 bridge over Sandy Run Creek.[3] The complaint alleged that the railroad bridge impeded the flow of Sandy Run Creek, which caused flooding and damage to Miller's hotel. Miller sought damages to recover his repair costs and his lost profits and earnings. In its answer, SEPTA admitted that it owned and maintained the 1912 railroad bridge that collapsed in 2001. However, it denied all other allegations in the complaint. The parties then engaged in discovery.

In his deposition, Miller testified about the 1996, 1999 and 2001 floods, which caused a "sort of Biblical destruction" to the hotel's basement and first floor. Reproduced Record at 98a (R.R. ——). He estimated that his hotel sustained $2 million in damages in each flood. When the 1912 bridge collapsed during the 2001 flood, Miller noticed that the flood waters receded more quickly than they had in 1996 and 1999. He also noticed that SEPTA's replacement bridge was built at a higher level and with wider spans between the supporting piers, thereby providing more space for a swollen Sandy Run Creek to pass underneath. These observations caused Miller to suspect that SEPTA's 1912 bridge had been responsible for the flooding to his hotel.

Miller secured an October 6, 2008, report from Glenn J. Eby, P.E., of Robert E.

---

1. Miller bought the hotel in 1996 and in 1998 transferred it to the I26 Hotel Corporation, which is wholly-owned by Miller.

2. Miller also brought negligence claims against numerous other entities including CSX Corporation, Consolidated Rail Corporation, Norfolk Southern Rail Corporation and Amtrak. All other defendants were dismissed from the action, leaving only SEPTA.

3. Specifically, in Count I of the complaint, Miller alleged that SEPTA was negligent in:

    (a) Failing to routinely and properly inspect the subject bridge to ensure that the same was in a reasonable, good, and fit condition;

    (b) Failing to properly maintain the subject bridge in a reasonable, good, and fit condition;

    (c) Permitting the bridge to lapse into a state of such disrepair that it caused the Sandy Run Creek to flood;

    (d) Permitting the bridge to lapse into such a state of disrepair that it collapsed in June, 2001, causing the Sandy Run Creek to flood;

    (e) Failing to maintain its property with due regard and consideration for the rights of other property owners, such as Plaintiffs, and their property; and

    (f) Failing to effect repairs on the subject bridge in a routine and timely manner so as to ensure that the same was in a reasonably safe and secure condition.

Reproduced Record at 12a–13a; Complaint ¶ 37. As can be seen, Miller's complaint alleges negligent maintenance of the bridge and not negligent design. Miller's brief discussed negligent bridge design. However, at oral argument, Miller made it clear that his action was a negligent bridge maintenance case, not a negligent design case.

Count X of the complaint is I26 Hotel Corporation's negligence action against SEPTA. Count X is identical to Count I. None of the other counts are relevant here.

Blue, Consulting Engineers, P.C., who concluded that the twin arches of the 1912 bridge acted as a "choke point" that restricted the flow of Sandy Run Creek and caused a backup of upstream waters. R.R. 183a. Eby also opined that a silt deposit under the bridge had exacerbated the choke point and caused flooding upstream of the bridge, where the Cherry Tree Hotel is located.

SEPTA obtained a March 5, 2010, engineering report from Roger W. Ruggles, Ph.D., P.E. Ruggles opined that the railroad bridge's design was "a sound engineering design" for 1912. R.R. 199a. Ruggles explained that when the bridge was originally built, the land upstream consisted of marshland, which acted like a sponge for absorbing storm water runoff. However, over the years, the marsh became developed, and this development increased storm water runoff into Sandy Run Creek by approximately 35 percent as of 2008.

When discovery closed, SEPTA moved for summary judgment. It asserted that because Miller's common law negligence claim was based upon SEPTA's alleged faulty maintenance of the 1912 railroad bridge, it was preempted by the Federal Railroad Safety Act (Railroad Safety Act).[4] The trial court agreed.[5] Relying upon this Court's holding in *Mastrocola v. Southeastern Pennsylvania Transportation Authority*, 941 A.2d 81 (Pa.Cmwlth.2008), the trial court concluded that the Railroad Safety Act preempted Miller's common law tort action. Accordingly, it granted judgment to SEPTA.

Miller appealed to this Court, and he raises one issue for our consideration.[6] He contends that the trial court erred because Congress did not intend the Railroad Safety Act to preempt state common law claims for property damage caused by a railroad's negligent maintenance of its bridge.

■ We begin with a discussion of the principles of federal preemption, which are derived from the Supremacy Clause found in Article VI, Clause 2 of the United States Constitution.[7] The Supremacy

4. 49 U.S.C. §§ 20101–20167.

5. SEPTA had previously moved for partial summary judgment on the basis that any claim for damages resulting from the September 1996 and September 1999 floods was barred by the two-year statute of limitations for negligence claims. By interlocutory order dated December 3, 2009, the trial court denied the motion for partial summary judgment without an accompanying opinion. SEPTA appealed. By order dated January 3, 2012, this Court dismissed SEPTA's appeal without prejudice because SEPTA was no longer aggrieved by the denial of partial summary judgment when the trial court subsequently granted summary judgment in its favor on the preemption issue. This Court gave SEPTA leave to discuss the statute of limitations in its brief in this appeal as an alternative theory for affirming the trial court's order. SEPTA raises the statute of limitations issue in its brief but, given our disposition of the case, we need not further address the issue.

6. Summary judgment is appropriate only where there are no genuine issues of material fact, and it is clear that the moving party is entitled to judgment as a matter of law. *Luzerne County Retirement Board v. Seacrist*, 988 A.2d 785, 787 n. 3 (Pa.Cmwlth.2010). When reviewing a grant of summary judgment, our scope of review is plenary, and our standard of review is *de novo*. *Davis v. Southeastern Pennsylvania Transportation Authority*, 980 A.2d 709, 711 n. 3 (Pa.Cmwlth.2009).

7. It provides in relevant part:

This Constitution and the Laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. CONST. art. VI, cl. 2.

Clause makes federal law the supreme law of the land and resolves conflicts between federal and state law in favor of federal law. *Krentz v. Consolidated Rail Corporation*, 589 Pa. 576, 595, 910 A.2d 20, 31–32 (2006). Federal law can preempt state law expressly; by occupying the field in a way to exclude state law; or because the state law conflicts with the federal law. Our Supreme Court has explained these three types of preemption as follows:

> First, state law may be preempted where the United States Congress enacts a provision which expressly preempts the state enactment. Likewise, preemption may be found where Congress has legislated in a field so comprehensively that it has implicitly expressed an intention to occupy the given field to the exclusion of state law. Finally, a state enactment will be preempted where a state law conflicts with a federal law. Such a conflict may be found in two instances, when it is impossible to comply with both federal and state law or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Office of Disciplinary Counsel v. Marcone*, 579 Pa. 1, 17, 855 A.2d 654, 664 (2004) (internal citations and quotations omitted). The "critical question in any preemption analysis is whether Congress intended that the federal enactment supersede state law." *Krentz*, 589 Pa. at 596, 910 A.2d at 32. If a federal statute has an express preemption provision, the plain words of that expression of preemption guide the preemption analysis. *Id.*

Our focus, here, is the Railroad Safety Act, whose stated purpose is "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. To meet this purpose, the Railroad Safety Act man-

dates that the "Secretary of Transportation, as necessary, shall prescribe regulations and issue orders for *every area of railroad safety* . . . ." 49 U.S.C. § 20103(a) (emphasis added). The Railroad Safety Act contains an express preemption provision, which states as follows:

(a) **National uniformity of regulation.**

> (1) *Laws,* regulations, and orders *related to railroad safety* and laws, regulations, and orders related to railroad security *shall be nationally uniform to the extent practicable.*

> (2) *A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation* (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), *prescribes a regulation or issues an order covering the subject matter of the State requirement.* A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order—

> (A) is necessary to eliminate or reduce an essentially local safety or security hazard;

> (B) is not incompatible with a law, regulation, or order of the United States Government; and

> (C) does not unreasonably burden interstate commerce.

(b) **Clarification regarding State law causes of action.**

> (1) Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party—

> (A) has failed to comply with the Federal standard of care estab-

lished by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;

(B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or

(C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2).

(2) This subsection shall apply to all pending State law causes of action arising from events or activities occurring on or after January 18, 2002.

(c) **Jurisdiction.** Nothing in this section creates a Federal cause of action on behalf of an injured party or confers Federal question jurisdiction for such State law causes of action.

49 U.S.C. § 20106 (emphasis added).[8] This express preemption provision guides our analysis here.

The United States Supreme Court specifically addressed Section 20106 of the Railroad Safety Act in *CSX Transportation, Inc. v. Easterwood,* 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). In that case, a truck collided with a train at a railroad crossing, killing the driver of the truck. His widow filed a tort claim in Georgia state court alleging, *inter alia,* that CSX had been negligent because it did not install adequate warning devices at the crossing and because its train was travel-

ing at an unsafe speed for the place where the accident occurred. CSX asserted that Easterwood's common law action had been preempted by the Railroad Safety Act. The Supreme Court agreed in part and disagreed in part.

The Supreme Court began with Section 20106(a)(2), which allows states to regulate railroads *until* the Secretary adopts a regulation or order on the subject matter of the state requirement. 49 U.S.C. § 20106(a)(2). Because the Secretary had not issued a regulation on railroad warning devices at crossings, the Supreme Court found that part of Easterwood's common law action not to be preempted. On the other hand, because the Secretary had issued a regulation setting speed limits for each class of track, it held that part of Easterwood's action to be preempted. At the moment of impact, CSX's train had been traveling at a speed below the 60 mph limit set by federal regulation.

Easterwood contended that although the train's speed complied with the federal regulation, it was unsafe. Under Georgia's common law, CSX had a duty to make sure that its trains travelled at an even slower speed when tracks crossed a road. Easterwood also argued that the federal regulation was inapposite because the speed limit was intended to prevent train derailments, not to make grade crossings safer. The Court rejected these arguments, explaining that the reasons for the Secretary's regulation were irrelevant to a preemption analysis. The only relevant inquiry is whether the federal regulation covered the subject matter of the state lawsuit. Without question, the Secretary's regulation specifically covered the subject matter of train speed and, thus,

---

8.  49 U.S.C. § 20106 was amended by Section 1528 of the "Implementing Recommendations of the 9/11 Commission Act of 2007," P.L. 110–53, which was signed into law by President George W. Bush on August 3, 2007. The amendment restated the previously existing federal preemption rule in subsection (a), and added subsections (b) and (c).

preempted Easterwood's common law claim in that regard.

This Court's holding in *Mastrocola v. Southeastern Pennsylvania Transportation Authority*, 941 A.2d 81 (Pa.Cmwlth. 2008), is also instructive on the scope and meaning of Section 20106 of the Railroad Safety Act. In *Mastrocola*, homeowners filed a common law tort claim against SEPTA for the damage to their homes allegedly caused by vibrations from SEPTA trains traveling over its temporary railroad tracks. The homeowners asserted that SEPTA had been negligent in its construction of the temporary tracks, notwithstanding the fact that they had been constructed in accordance with the Railroad Safety Act's regulations. This Court held that the homeowners' suit was preempted because the Railroad Safety Act's regulations covered the subject matter of track construction. We rejected the homeowners' argument that the track regulations were irrelevant because they concerned railroad safety, not the prevention of property damage. Drawing on *Easterwood*, we explained that preemption is not determined by "the stated intent of the federal and state laws but, rather, whether the laws operate upon the same object." *Mastrocola*, 941 A.2d at 92.[9]

■ In Section 20106, Congress authorized state law to remain in force "*until* the Secretary of Transportation . . . prescribes a regulation or issues an order *covering the subject matter* of the State requirement." 49 U.S.C. § 20106(a)(2) (emphasis added). As was the case in *Easterwood* and *Mastrocola*, the Secretary has promul-

gated a regulation that is dispositive of the preemption issue raised by Miller's appeal.

The Secretary of Transportation has adopted a regulation specifically addressing the drainage issues posed by railroad tracks. Section 213.33 of the "Track Safety Standards" regulation states as follows:

> Each drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned.

49 C.F.R. § 213.33. Miller argues that Section 213.33 does not govern the preemption question because it does not relate to a railroad bridge and, in any case, concerns track safety not flooding. SEPTA responds that, as established in *Easterwood*, the reasons for the regulation are irrelevant to preemption. The only relevant question is whether the regulation at 49 C.F.R. § 213.33 covers the subject matter of Miller's complaint and if so, the state law claim is preempted.

In support, SEPTA points to *Rooney v. City of Philadelphia*, 623 F.Supp.2d 644 (E.D.Pa.2009). In *Rooney*, landowners brought a common law negligence action against Amtrak, seeking damages for flooding to their properties and businesses that occurred when 14 feet of water accumulated under Amtrak's railroad bridge during a severe storm.[10] The landowners alleged that the flooding was caused, in part, by Amtrak's failure to clean the drains under the bridge, which were clogged with mud and ballast. Citing the Secretary's regulation that requires a rail-

---

**9.** The Pennsylvania Supreme Court granted the homeowners' petition for allowance of appeal. *Mastrocola v. Southeastern Pennsylvania Transportation Authority*, 601 Pa. 383, 973 A.2d 412 (2009). However, the homeowners discontinued their appeal before our Supreme Court issued a decision.

**10.** The railroad bridge runs overtop the intersection of 62nd Street and Woodbine Avenue in Philadelphia.

road to keep drainage near a roadbed "free of obstruction, to accommodate expected water flow," 49 C.F.R. § 213.33, the U.S. District Court concluded that the regulation covered the subject matter of the state tort claim and, thus, preempted the complaint. The District Court held that "roadbed," which is not defined in the regulation, "commonly refers to the area under and adjacent to the tracks." *Rooney*, 623 F.Supp.2d at 664. This included tracks located on a bridge. The court granted summary judgment in Amtrak's favor on the basis of federal preemption.

■ The facts in *Rooney* are nearly identical to those in the case *sub judice:* both cases involved a railroad bridge that allegedly caused flooding and property damage to persons located near the offending bridge. Both sought damages under Pennsylvania's common law. When interpreting federal statutes, state courts are "not bound by decisions of federal courts inferior to the United States Supreme Court, even though we may look to them for guidance." *Commonwealth v. Ragan,* 560 Pa. 106, 118, 743 A.2d 390, 396 (1999). Although not bound by the District Court's holding in *Rooney,* we find it persuasive. We adopt its analysis and logic as our own.

The regulation in question requires SEPTA to "accommodate expected water flow for the area concerned" lying "under ... the roadbed," *i.e.,* water must be allowed to flow under a bridge without obstruction. 49 C.F.R. § 213.33.[11] This construction of Section 213.33 is consistent with the Federal Railroad Administration's own interpretation of the regulation.[12] In its Final Statement of Agency Policy on August 30, 2000, the Federal Railroad Administration stated that the regulation at 49 C.F.R. § 213 covers bridges. The policy statement provided, *inter alia,* as follows:

> The Federal Track Safety Standards already address floods and wash-outs by requiring railroads to properly maintain drainage facilities under and adjacent to roadbeds, *including bridges.* See 49 CFR 213.33. The Track Safety Standards also require in 49 CFR 213.239 that railroads perform special inspections following floods, fire, severe storms, or other occurrences that might have damaged track structure. [The Federal Railroad Administration] considers any damage to the track or its supporting structures, including bridges, that renders the track incapable of safely carrying its traffic loads, to come under the provisions of this section of the Track Safety Standards.

65 Fed.Reg. 52669 (August 30, 2000) (emphasis added).[13]

**11.** Judge McCullough's dissent contends that Section 213.33 applies only to man-made water systems, not streams. "Facility" is a term so broad that it covers both artificial and natural water courses. Were it otherwise, the result could be anomalous. The railroad would be required to maintain a culvert it constructs under its tracks, but it would not have to ensure that a natural creek could flow under a railroad bridge unobstructed. The dissent's effort to distinguish *Rooney* leads to the same curious conclusion. Landowners whose property is flooded by a railroad's backed up man-made pipes under its bridge would have their claims preempted; these claims would not be preempted if the railroad failed to allow a natural stream to drain properly.

**12.** The Secretary acts through the Federal Railroad Administration when promulgating regulations under the Railroad Safety Act. *Easterwood,* 507 U.S. at 662, 113 S.Ct. 1732.

**13.** Judge McCullough's dissent posits that the flow of the creek underneath SEPTA's bridge did not impact "railroad operations" or "railroad safety" and, thus, is not encompassed by the Railroad Safety Act. In doing so, the dissent overlooks the above-quoted statement of the Federal Railroad Administration that railroads must allow for drainage under their

We conclude that the subject matter of 49 C.F.R. § 213.33 and Miller's complaint are the same and cannot be distinguished. The stated purpose of the regulation, *i.e.,* safety, is irrelevant to the preemption analysis. Under *Easterwood,* Miller's common law action is preempted because its subject matter, the duty to maintain a water course "under . . . the roadbed" and "kept free of obstruction," is the subject of 49 C.F.R. § 213.33.

█ Nevertheless, Miller argues that even if Section 213.33 covers the subject matter of his complaint, the Commonwealth may impose a stricter standard upon a railroad so long as it is not incompatible with the federal regulation. Relying upon the saving clause in Section 20106(a)(2)(A)-(C) of the Railroad Safety Act, Miller argues that there is no reason why requiring SEPTA to comply with its common law duty to prevent flooding cannot be reconciled with the objectives of the Railroad Safety Act.[14]

·SEPTA rejoins that a reconciliation is impossible. Allowing a jury to decide on a case-by-case basis what constitutes proper bridge maintenance would allow lay people to take over the job of qualified inspectors. The resulting piecemeal rulings would directly undermine the stated goal of the Railroad Safety Act to achieve a national and uniform system of railroad regulation. 49 U.S.C. § 20106(a). Further, SEPTA would be required to rebuild a bridge

whenever real estate development, over which it has no control, increases storm water runoff thereby raising the level of streams under an existing bridge. The Railroad Safety Act requires a railroad "to accommodate *expected* water flow." 49 C.F.R. § 213.33 (emphasis added). Here, the bridge in question was able to accommodate expected water flow when it was built in 1912; SEPTA had no duty to rebuild the bridge when conditions changed by reason of the acts of third-party developers. We agree.

█ The saving clause in Section 20106(a)(2)(A)-(C) of the Railroad Safety Act saves state law from preemption only in limited circumstances. Specifically, a state may continue to impose stricter state regulation when such a law: "(A) is necessary to eliminate or reduce an essentially local safety or security hazard; (B) is not incompatible with a law, regulation, or order of the United States Government; and (C) does not unreasonably burden interstate commerce." 49 U.S.C. § 20106(a)(2)(A)-(C). The state law must fulfill all three requirements in order to avoid preemption. *Krentz,* 589 Pa. at 597, 910 A.2d at 32.

In *Easterwood,* the U.S. Supreme Court held that Georgia's common law covering safe train speed was not saved by Section 20106(a)(2)(A)-(C) because the common law of negligence does not address an "essentially local safety hazard." *Easterwood,*

---

*bridges* to prevent floods and wash-outs, and that any damage "to the track or its supporting structures, including bridges" is a safety issue governed by Section 213.33. Here, the bridge and the railroad tracks collapsed during the 2001 flood, which impacted both railroad operation and safety.

14. Miller cites *Helms v. Zeitzeff,* 407 Pa. 482, 181 A.2d 277 (1962), to explain the common law duty of a landowner to prevent flooding to a neighbor's land. In *Helms,* a landowner diverted a creek so that it would run under

his property in pipes buried beneath the soil. Because the landowner failed to seal the pipes together, the pipes eventually became clogged with dirt and did not allow the water to flow, causing it to back up and flood neighboring property. Our Supreme Court held that a landowner may not, either intentionally or negligently, obstruct a natural watercourse flowing over his land "so as to damage the land higher up on the stream." *Id.* at 485, 181 A.2d at 278.

507 U.S. at 675, 113 S.Ct. 1732. At grade crossings are not unique to Georgia. Further, "reliance on the common law [is] 'incompatible with' [the Railroad Safety Act] and the Secretary's regulations" because it would deprive the Secretary of the power to achieve national uniformity of regulation. *Id.* Following *Easterwood,* this Court likewise held in *Mastrocola* that the Railroad Safety Act's saving clause did not authorize the homeowners' common law action. The subject matter of the homeowners' negligence claim was incompatible with the applicable Railroad Safety Act regulation on temporary track construction and did not relate to an "essentially local safety hazard." *Mastrocola,* 941 A.2d at 94. The U.S. District Court reached the same conclusion in *Rooney,* noting that allowing a common law negligence claim to proceed "would thwart [the Railroad Safety Act's] goal of achieving uniform, national standards for railroad operations." *Rooney,* 623 F.Supp.2d at 666 n. 19.

*Easterwood, Mastrocola* and *Rooney* each concluded that a state common law negligence action was not saved from preemption under the three-part test of Section 20106(a)(2)(A)-(C) of the Railroad Safety Act. Their precedent is instructive here. First, the common law of negligence cited by Miller does not address a local hazard; it is statewide in scope. Second, even were our common law to meet the "local hazard" requirement, it must be compatible with federal regulation if it is to be saved from preemption. The maintenance of a railroad bridge "to accommodate expected water flow" is a subject totally occupied by Section 213.33, leaving no place for additional state regulation. Third, complying with the common law of 50 states on the matter of railroad bed drainage would burden interstate commerce by impeding the establishment of a national and uniform system of railroad

regulation. Simply, Miller cannot satisfy any of the three requirements of the savings clause, and he must satisfy *all* in order to prevail.

Miller next invokes a recent holding of the United States Supreme Court. In *Wyeth v. Levine,* 555 U.S. 555, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009), the Supreme Court instructed that courts should start with the presumption that there is no preemption of state law. According to Miller, the fact that the Railroad Safety Act does not provide a remedy for property damage means that Congress must have intended to allow state tort actions to be brought against railroads for the flood damage caused by their improperly maintained bridges. Miller urges that *Mastrocola* is not controlling here because it was decided prior to *Wyeth.*

SEPTA responds that *Wyeth* is distinguishable and, in any case, did not overrule the Supreme Court's holding in *Easterwood* on the Railroad Safety Act's express preemptive provision. We agree.

In *Wyeth,* the United States Supreme Court held that the Federal Food, Drug, and Cosmetic Act (Food and Drug Act), 21 U.S.C. §§ 301–399f, and its regulations did not preempt a state tort claim that a drug manufacturer had failed to include an adequate warning on the drug Phenergan's label about the dangers of the IV-push method of administration. This was so even though the FDA had approved the drug's labeling. The Supreme Court focused on the fact that the Food and Drug Act did not contain an express preemption provision. To the contrary, the federal statute preserved state law unless it was in "direct and positive conflict" with the Food and Drug Act. *Wyeth,* 555 U.S. at 567, 129 S.Ct. 1187. Further, federal regulations adopted under authority of the Food and

Drug Act specifically allowed drug manufacturers to strengthen a drug warning on their own initiative.

In its preemption analysis, the Supreme Court explained that "the purpose of Congress is the ultimate touchstone in every preemption case." *Wyeth*, 555 U.S. at 565, 129 S.Ct. 1187 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)). The Supreme Court further instructed that "in all preemption cases, . . . we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Id.* (quoting *Lohr*, 518 U.S. at 485, 116 S.Ct. 2240). This above-quoted instruction does not change the analysis here.

In *Wyeth*, the Supreme Court did not discuss the Railroad Safety Act or, for that matter, its holding in *Easterwood*.[15] Critically, *Easterwood* contains language not unlike that used in *Wyeth*, where the Supreme Court cautioned:

> In the interest of avoiding unintended encroachment on the authority of the States, however, *a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption.* Thus, pre-emption will not lie unless it is "the clear and manifest purpose of Congress."

*Easterwood*, 507 U.S. at 663–64, 113 S.Ct. 1732 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)) (emphasis added).[16] Nevertheless, the Supreme Court found

---

**15.** Miller also relies heavily on *Dooner v. DiDonato*, 601 Pa. 209, 971 A.2d 1187 (2009). There, the Pennsylvania Supreme Court, citing *Wyeth*, analyzed the language of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78pp, and held that it did not preempt a stock trader's state law tort claims stemming from an assault·he suffered on the floor of the Philadelphia Stock Exchange. The federal statute did not address the subject matter of the *Dooner* claim, *i.e.*, the physical exchange of blows on the floor of the stock exchange.

**16.** Judge Cohn Jubelirer's dissent challenges the majority's holding that the regulation at 49 C.F.R. § 213.33 preempts Miller's common law tort action. In doing so, the dissent argues that a roadbed is not a bridge; a creek is not a "water carrying facility;" and that states may regulate the safety of a bridge construction.

The regulation at Section 213.33 is broadly worded to ensure that a railroad's roadbed, whenever located, will "accommodate expected water flow." Roadbeds can be found on bridges over rivers and lakes; on causeways that cross large bodies of water; next to a river, lake or ocean; or in tunnels thereunder. The regulation deals with safety issues posed by roadbeds in locations near or on water that could cause flooding. The regulation

requires railroads to keep water courses near the roadbed "free of obstruction, to accommodate expected water flow." The federal agency responsible for enforcement of 49 C.F.R. § 213.33 has stated that its regulation addresses floods and wash-outs by requiring railroads to properly maintain drainage facilities under and adjacent to roadbeds, *including bridges.*
65 Fed.Reg. 52669 (August 30, 2000).

The dissent relies principally upon a policy statement issued by the Federal Railroad Administration, which addresses the load bearing capacity of railroad bridges. Nowhere does it mention flooding issues posed by railroad bridges. As a policy statement, it does not have the binding effect of the regulation at 49 C.F.R. § 213.33. Further, it is not definitive; it advises merely that the policy *"should* not preempt regulatory action by state." 65 Fed.Reg. 52667–01 (August 30, 2000). Many bridges are used both by motor vehicles and railroads; in that case, dual regulation of the bridge's structure is necessary. Further, there is no reason to conclude that state "regulatory action" encompasses state common law. That states may have a role to play in the structural design and construction of a railroad bridge is irrelevant to Miller's action. He does not claim that the bridge was structurally unsound, only that its lack of maintenance caused a stream to flood his property.

preemption under the Railroad Safety Act in *Easterwood.* The Court did so after stating:

> Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue. If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on *the plain wording of the clause,* which *necessarily contains the best evidence of Congress' pre-emptive intent.*

*Easterwood,* 507 U.S. at 664, 113 S.Ct. 1732 (emphasis added) (internal citation omitted).

Miller invites this Court to infer that because Congress did not provide a remedy for property owners who suffer property damage because of a poorly maintained bridge, they may proceed with a state common law negligence claim. We decline to do so. The Railroad Safety Act contains an express preemption provision, and its plain language must prevail. As this Court explained in *Mastrocola,* the fact that the Railroad Safety Act does not provide a remedy for property damage is of no moment because courts look at the subject matter of the state law action, not the remedy, when considering whether the state law is preempted.

Finally, Miller argues that Congress specifically "clarified" the Railroad Safety Act as not preempting state law actions seeking property damage. In 2007, Congress added subsections (b) and (c) to Section 20106 of the Railroad Safety Act, which Miller sees as a clear indication that the Railroad Safety Act was never meant to preempt state common law claims in negligence.

Subsection (b) clarifies that state law actions are not preempted where it is alleged that the defendant "has failed to *comply with the Federal standard of care* established by a regulation" or with a state law not incompatible with the federal regulation. 49 U.S.C. § 20106(b)(1)(A) (emphasis added). The 2007 amendment was enacted in response to a federal court decision holding that a railroad's violation of federal regulations did not create liability for the railroad under state common law. As we explained in *Mastrocola,* which specifically addressed the 2007 amendment to the Railroad Safety Act,

> the amendment, by its own title, is merely a clarification of what is not preempted by [the Railroad Safety Act], and *does not alter the substance of the federal preemption analysis provided for in 49 U.S.C. § 20106(a).*

*Mastrocola,* 941 A.2d at 90 n. 12 (emphasis added). The 2007 amendment did not express an intention to allow any common law claim to be filed against a railroad. Rather, it must be alleged that the federal regulation was violated. Miller does not make that claim.[17] Alternatively, it must be shown that the state law claim is not incompatible with the federal regulation. In this regard, Section 20106(b)(1)(C) of the Railroad Safety Act refers back to the three-part saving test in Section 20106(a)(2)(A)-(C), which must be satisfied before a state law common law claim can be pursued against a railroad. Miller cannot, for the reasons explained above, satisfy the three-part test in Section 20106(a)(2)(A)-(C). In short, the 2007 amendments do not advance Miller's argument.

---

**17.** A claim that a federal regulation was violated can only be made for an event "occurring on or after January 18, 2002." 49 U.S.C. § 20106(b)(2). The flooding in this case occurred in 1996, 1999 and 2001. Miller's complaint does not allege a violation of either the federal statute or regulation.

The trial court did not err in granting summary judgment in SEPTA's favor because Miller's state common law negligence claim has been preempted by the Railroad Safety Act. Accordingly, the order of the trial court is affirmed.

### ORDER

AND NOW, this 7th day of March, 2013, the order of the Court of Common Pleas of Montgomery County dated April 20, 2011, in the above-captioned matter is hereby AFFIRMED.

### DISSENTING OPINION BY Judge COHN JUBELIRER.

Because there is a longstanding presumption "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), I respectfully dissent. *See also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (stating that "because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly preempt state-law causes of action"); *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (stating that "[c]onsideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress' " (quoting *Rice*, 331 U.S. at 230, 67 S.Ct. 1146)). This "approach is consistent with both federalism concerns and the historic primacy of state regulation," *Medtronic*, 518 U.S. at 485, 116 S.Ct. 2240, including riparian rights and tort law that are addressed by the state law at issue in this case.

The Majority finds preemption in this case based upon a federal regulation governing "roadbed," a term that is not defined in the Federal Railroad Safety Act (FRSA), 49 U.S.C. §§ 20101–20167, or the regulations thereunder providing that "[e]ach drainage or other water carrying *facility* under or immediately adjacent to the *roadbed* shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned." [1] 49 C.F.R. § 213.33 (emphasis added). I agree with Judge McCullough's dissenting opinion that this regulation relates to drainage *facilities*, [2] such as sewer systems, and not to creeks running beneath a railroad bridge. *Miller v. Southeastern Pennsylvania Transportation Authority*, 65 A.3d 1006, 1022, 2013 WL 830715 (Pa.Cmwlth.2013) (McCullough, J., dissenting). Moreover, even if this regulation applied in this context, it expressly "prescribes minimum requirements for roadbed and areas immediately adjacent to roadbed." 49 C.F.R. § 213.31.

1. The FRSA authorizes the Secretary of Transportation to "prescribe regulations and issue orders for every area of railroad safety." 49 U.S.C. § 20103. Pursuant to 49 U.S.C. § 322(b), the Secretary of Transportation has delegated this authority to the Federal Railroad Administration (FRA), 49 C.F.R. § 1.89(e), which has issued regulations covering track standards.

2. Notably, Miller's allegations do not concern drainage "facilities," such as sewer systems, roadbeds, tracks, track safety or railroad safety, but whether SEPTA's defective design, construction, or maintenance of the railroad bridge caused it to act as a dam creating a choke point which failed to allow for a sufficient lateral flow of water that interfered with Miller's upstream riparian rights under Pennsylvania law, thereby allegedly causing substantial flooding damage to Miller's business property. (Miller's Br. at 6.)

More importantly, the regulation relied upon by the Majority does not relate to *bridges*. In fact, there are no regulations for "bridges" or "bridge safety" under the FRSA, but only an advisory policy known as the Policy on the Safety of Railroad Bridges (Railroad Bridge Policy). Final Statement of Agency Policy, 65 Fed.Reg. 52667–01 (August 30, 2000). The Railroad Bridge Policy provides that its purpose is to "suggest[ ] criteria for railroads to use to ensure the structural integrity of bridges that carry railroad tracks." *Id.* The Railroad Bridge Policy expresses concern about *train* accidents and the safety of *train* operations, and its purpose and objective does not relate to any of Miller's allegations involving state riparian or tort law. Notably, it assigns responsibility for proper maintenance of bridges supporting railroad tracks to the local track owner as follows:

> The Federal Track Safety Standards prescribe the track owner as the party responsible for proper maintenance of the tracks. It follows, therefore, that compliance with the track standards necessitates that the track owner also maintain any structure supporting the track, be it a bridge or an earth structure. Where a bridge owner is not the track owner, the bridge owner is responsible to the track owner for the integrity of the bridge. Likewise, the track owner is responsible to other railroads operating over its track for the integrity of both the track and the bridges which support it.

*Id.* The Railroad Bridge Policy states that the Federal Railroad Administration (FRA) will "cooperate with states to the fullest extent feasible to resolve railroad bridge safety problems," and further notes that the "FRA owns no bridges, and generally does not fund bridge maintenance or construction." *Id.* In concluding that the vast majority of railroad bridges in the nation are adequately maintained, the Railroad Bridge Policy states that it neither "impl[ies] that every railroad bridge in every state meets the minimum guidelines" nor should it "preclude any state from addressing safety issues concerning railroad bridges within that state." *Id.* Additionally, most importantly for this case, *the Railroad Bridge Policy expressly states that it does not preempt regulatory actions by states.*

> In stating its intent that this policy statement should not preempt regulatory actions by states, FRA is adhering to the principles of Executive Order 13132 issued on August 4, 1999, which directs Federal agencies to exercise great care in establishing policies that have federalism implications.... Section 3(a) of the Executive Order requires Federal agencies to "closely examine the constitutional and statutory authority supporting any action that would limit the policymaking discretion of States and ... carefully assess the necessity for such action." In Section 3(b), ·the Executive Order continues, "National action limiting the policymaking discretion of the States shall be taken only where there is constitutional and statutory authority for the action and the national activity is appropriate in light of the presence of a problem of national significance." Of course, FRA has the constitutional and statutory authority to issue guidelines addressing railroad bridge safety, but the agency has not found a "problem of national significance" of such a dimension to warrant limiting state policymaking discretion in addressing the same subject matter. In light of this conclusion, a Federalism Assessment pursuant to Executive Order 13132 is not required.

*Id.* (Internal Citation omitted.) This express statement in the Railroad Bridge

Policy, taken in conjunction with the *Rice* presumption against preemption, persuades me that there is no clear Congressional purpose to preempt the state law issues in this case.

Additional support is found in the distinguishing facts of the cases relied upon by the Majority. In *Mastrocola v. Southeastern Pennsylvania Transportation Authority*, 941 A.2d 81 (Pa.Cmwlth.2008), the claims involved deficiencies in the spacing of gaps, bolts, and weldings in temporary track construction. Because this was an area specifically covered by federal regulation, our Court held that preemption precluded the state claims. In *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993), one of the two claims involved train speed. Because train speed was an area specifically covered by federal regulation, the United States Supreme Court determined that preemption foreclosed the state law claims. *Id.* at 675, 113 S.Ct. 1732. However, in *Easterwood* there was an additional claim for which no preemption was found. Stating that "preemption will not lie unless it is 'the clear and manifest purpose of Congress,'" no preemption was found for the claim involving railroad crossing warning devices because the maintenance and operation of trains at grade crossings was traditionally one addressed by state tort law. *Id.* at 664, 113 S.Ct. 1732 (quoting *Rice*, 331 U.S. at 230, 67 S.Ct. 1146).

Finally, in *Rooney v. City of Philadelphia*, 623 F.Supp.2d 644, 666 (E.D.Pa. 2009), summary judgment was granted to Amtrak because it was determined that the City of Philadelphia (City), not Amtrak, had responsibility to maintain the sewer drains. Therefore, because the City, and not Amtrak, had the duty to maintain the sewer drains, (i.e., "facilities"), there was a genuine issue of materi-

al fact regarding whether the City had negligently maintained the sewer system and summary judgment was denied to the City, the party who had the duty. However, in the case at bar SEPTA has the responsibility for any drainage issues involving the bridge and, having this duty, there are material issues remaining to be resolved.

Because "federal preemption analysis always starts with a question of congressional intent, and then proceeds to a discussion of the state law's interaction with the federal law or regulation," *Rooney*, 623 F.Supp.2d at 663, I do not believe that the policies of the FRSA, or the regulations promulgated thereunder which set only minimum standards, necessarily conflict with existing riparian or other rights under state law. As stated in *Wyeth v. Levine*, 555 U.S. 555, 578, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009), handed down after the decisions relied upon by the Majority, establishing minimal standards does not preclude the states from imposing additional requirements. And, in *Dooner v. DiDonato*, 601 Pa. 209, 231, 971 A.2d 1187, 1200–01 (2009), even recognizing a different factual context, our Supreme Court has stated:

> Indeed, we would be wary to hold state tort law claims ... to be preempted because of a conflict concerning an incidental aspect of the federal regulatory scheme. This is especially true here where the law ... argue[d to be] preempted is historically and traditionally a state law domain. Pennsylvania has a strong public policy of protecting individuals ... and allowing damages for the breach of relevant duties—such long-standing policy should prevail absent any significant interference with the federal regulatory scheme. Simply stated, we do not believe that our Commonwealth's common law should be summarily dismissed by what we believe to be an overly broad assertion of ob-

struction of purpose. Our conclusions regarding Congress' intent do not produce anomalous results. Consistent with United States Supreme Court case law, it would be entirely rational for Congress not to preempt common law claims, which—unlike most administrative and legislative regulations—necessarily perform an important remedial role in compensating victims of torts.

In the present case, there are no regulations covering bridges, but the Railroad Bridge Policy *expressly does not preempt* state law and even pledges full cooperation with the states. I find no merit in SEPTA's argument that the federal purposes would be frustrated or in conflict if we do not find preemption; on the contrary, safety would be enhanced and there would be no conflict. Therefore, I would not affirm the trial court's grant of summary judgment in favor of SEPTA based upon preemption and would address the statute of limitations issue raised by SEPTA in this case. *See Miller v. Southeastern Pennsylvania Transportation Authority,* 65 A.3d 1006, 1009 n. 5, 2013 WL 830715 (Pa. Cmwlth.2013).

President Judge PELLEGRINI and Judge McCULLOUGH join in this dissenting opinion.

## DISSENTING OPINION BY Judge McCULLOUGH.

I respectfully dissent from the Majority's thoughtful opinion because I do not believe that the state common law negligence action filed on behalf of David Miller and I26 Hotel Corporation (collectively, Miller) against the Southeastern Pennsylvania Transportation Authority (SEPTA) was preempted by federal law, namely, the Federal Railroad Safety Act (Railroad Safety Act).[1] Hence, I would reverse the

grant of summary judgment to SEPTA by the Court of Common Pleas of Montgomery County (trial court).

The Majority correctly notes that our Supreme Court has recognized three manners by which federal law can preempt state law: express preemption (federal law expressly preempts state enactment); comprehensive preemption (federal government has legislated in a field so comprehensively that it has implicitly expressed an intention to occupy the given field to the exclusion of state law); and conflict preemption (state law conflicts with federal law). *Office of Disciplinary Counsel v. Marcone,* 579 Pa. 1, 855 A.2d 654 (2004). The Majority also notes that the Railroad Safety Act contains an express preemption provision, which states, in pertinent part, as follows:

> *A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation* (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), *prescribes a regulation or issues an order covering the subject matter of the State requirement.* A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order—
>
> (A) is necessary to eliminate or reduce an essentially local safety or security hazard;
>
> (B) is not incompatible with a law, regulation, or order of the United States Government; and
>
> (C) does not unreasonably burden interstate commerce.

49 U.S.C. § 20106(a)(2) (emphasis added).

The Majority concludes that a federal regulation adopted by the Secretary of

---

1. 49 U.S.C. §§ 20101–20167.

Transportation, Section 213.33 of the "Track Safety Standards" regulations, covers the subject matter of this dispute, i.e., drainage issues relating to railroad tracks, such that Miller's state common law negligence action was preempted by the Railroad Safety Act. However, I disagree with the Majority's interpretation of this regulation.

Section 213.33 of the "Track Safety Standards" regulations states as follows:

> Each drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned.

49 C.F.R. § 213.33.[2] In my view, this regulation relates to man-made drainage systems, and not a creek, or the maintenance thereof, which runs beneath a railroad bridge. Such a construction is supported by the fact that the regulations do not define the phrase "water carrying facility."

Another section of the regulations, relating to "Informal Rules of Practice for Passenger Service," defines the term "facility" as follows:

> Facility means railroad tracks, right-of-way, fixed equipment and facilities, real-property appurtenant thereto, and includes signal systems, passenger station and repair tracks, station buildings, platforms, and adjunct facilities such as water, fuel, steam, electric, and air lines.

49 C.F.R. § 200.3. Additionally, "facility" is generally defined as "[s]omething that is built or installed to perform some particular function." Black's Law Dictionary 591 (6th ed.1990).

Neither the regulation at issue nor the definitions cited above encompass a creek

or the maintenance of the creek bed to prevent the accumulation of sediment caused by the railroad bridge's restriction of the creek's water flow, the basis of Miller's common law negligence claim. Indeed, Miller's engineer testified that the railroad bridge functioned like a dam, restricting the flow of Sandy Run Creek, and that a silt deposit under the bridge had exacerbated this restriction, resulting in flooding upstream where Miller's property was located.

Moreover, as the Majority acknowledges, the stated purpose of the Railroad Safety Act is "to promote safety in every area of *railroad operations* and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101 (emphasis added). To meet this purpose, the Railroad Safety Act mandates that the "Secretary of Transportation, as necessary, shall prescribe regulations and issue orders for every area of *railroad safety* . . . ." 49 U.S.C. § 20103(a) (emphasis added). In the present case, the flow of Sandy Run Creek underneath the railroad bridge neither directly nor indirectly impacted railroad safety or railroad operations. The resultant flooding occurred upstream and there is no allegation that the flooding encompassed or otherwise affected the railroad tracks on the bridge.

Furthermore, the cases cited by the Majority, *CSX Transportation, Inc. v. Easterwood,* 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) (claimant alleged train traveling at unsafe speed and regulation set forth speed limits for each class of track) and *Mastrocola v. SEPTA,* 941 A.2d 81 (Pa.Cmwlth.2008) (claimants alleged damage to property from vibrations of temporary tracks and regulation addressed track construction), clearly relate

---

**2.** Because the last incident of flooding which gave rise to Miller's action against SEPTA occurred in 2001, we look at the federal regulations in effect at that time in reviewing this matter. Hence, all citations above will be to the 2001 regulations.

to subject matters covered under the Railroad Safety Act and involve the operational safety of the respective trains. Hence, preemption was appropriate in those cases.

Even the federal court case upon which the Majority relies, *Rooney v. City of Philadelphia*, 623 F.Supp.2d 644 (E.D.Pa. 2009), is inapposite. In *Rooney*, the claimants had alleged damage from flooding to their respective properties resulting from Amtrak's failure to clean clogged drains underneath a railroad bridge. This clearly falls under section 213.33 of the "Track Safety Standards" regulations requiring drainage facilities to be kept "free of obstruction." The fact that the court in *Rooney* defined "roadbed" as "the area under and adjacent to the tracks" does not support the application of its reasoning to the present case. Again, the present case simply does not involve a drain or other water carrying facility. *Id.* at 664. Rather, the present case involves a claim against SEPTA for negligent maintenance of the railroad bridge and the resultant effects to Sandy Run Creek. Accordingly, I believe that the Majority incorrectly applies the analysis in *Rooney* to the facts of this case.

Because section 213.33 of the "Track Safety Standards" regulations does not address the issues raised in Miller's complaint, I would conclude that Miller's common law negligence action was not preempted by the Railroad Safety Act, and, recognizing that there remains a genuine issue of material fact, I would reverse the trial court's grant of summary judgment to SEPTA.

President Judge PELLEGRINI and Judge COHN JUBELIRER join in this opinion.