IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.**

| | | |
|---|---|---|
| NORENE M. MILLER, EXECUTRIX OF THE ESTATE OF DAVID MILLER, DECEASED AND I26 HOTEL CORPORATION , | : | No. 58 MAP 2013 |
| | : | |
| | : | Appeal from the Order of the Commonwealth Court entered on March 7, 2013 at 1876 C.D. 2011, affirming the Order of the Court of Common Pleas of Montgomery County entered on April 20, 2011 at No. 2003-10787 |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | 65 A.3d 1006 (Pa. Cmwlth. 2013) |
| | : | |
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, | : | |
| | : | |
| Appellee | : | ARGUED: March 12, 2014 |

**OPINION**

**MR. CHIEF JUSTICE CASTILLE**                    **DECIDED: October 30, 2014**

This case concerns the continued viability of the historic police power of this Commonwealth in validating and regulating riparian rights and remedies where it is alleged that a downstream landowner which is subject to federal rail-safety regulations obstructed a natural watercourse causing upstream flooding and significant damage as a result. As this is an area of law that has been regulated by the Commonwealth for centuries, and since we are not persuaded that there is a clear and manifest federal congressional intention to preempt Pennsylvania law on the issue presented -- as corroborated by the view of the local federal court -- we decline to invalidate the rights and remedies afforded to appellants under the laws of this Commonwealth.

Accordingly, we reverse the order below and remand the case to the Commonwealth Court for proceedings consistent with this Opinion.

Hotel owner David Miller and his hotel (appellants) sought to hold the Southeastern Pennsylvania Transportation Authority ("SEPTA") liable for water damage allegedly resulting from the negligent construction and/or maintenance of a nearby SEPTA-owned railroad bridge. Appellants purchased hotel property in Fort Washington, Pennsylvania, in 1996, and they claimed that the bridge thereafter obstructed the flow of a creek which ran under the bridge, causing the creek to flood appellants' upstream hotel on three separate occasions of extreme weather conditions. On each occasion, appellants experienced flooding that filled the hotel basement and first floor. In 2001, the hotel closed and appellants declared bankruptcy.

The bridge at issue, constructed in 1912 by the Philadelphia Reading Railroad and later acquired by SEPTA, was a stone arch railroad bridge that crossed Sandy Run Creek. In June of 2001 the bridge collapsed. In his deposition, Miller testified that the floods caused a "sort of Biblical destruction" to the hotel's basement and first floor, at an estimated cost of two million dollars in damages per flood. When the bridge collapsed during the 2001 flood, however, Miller noticed that the flooding receded more quickly than on prior occasions. He also noticed that SEPTA's replacement bridge was built with wider spans between the supporting piers, thereby providing more space for a swollen creek to pass through. In 2003, appellants filed a complaint against SEPTA alleging negligence in failing to properly care for, repair, inspect and maintain the bridge, seeking damages for recovery of repair costs, lost profits and lost earnings.

On October 6, 2008, Miller secured a report from an engineering consultant who concluded that the twin arches of the original bridge acted as a choke point that restricted the flow of the creek and caused a backup of upstream waters near the

location of the hotel. He also opined that a silt deposit under the bridge had exacerbated the choke point.

When discovery closed, SEPTA moved for summary judgment asserting appellants' common law negligence claim was preempted by the Federal Railroad Safety Act ("FRSA"), since it was based upon SEPTA's alleged faulty maintenance of a railroad bridge.[1] The trial court agreed, relying upon Mastrocola v. SEPTA, 941 A.2d 81 (Pa. Cmwlth. 2008) (determining common law tort claim against SEPTA regarding alleged negligent construction of temporary train tracks, for damage to homes allegedly caused by vibrations from passing trains, to be preempted by FRSA because FRSA's regulations covered subject matter of track construction). Thus, the trial court entered judgment in favor of SEPTA, and appellants appealed to the Commonwealth Court.

A divided Commonwealth Court, sitting *en banc*, affirmed in a published 4-3 decision, agreeing with the trial court that appellants' claims are preempted by the FRSA. The majority reasoned that, in 49 U.S.C. § 20106(a)(2), Congress authorized state law to remain in force only until the Secretary of Transportation prescribes a regulation covering the subject matter of the relevant state requirement, and here, the Secretary had, in fact, issued a regulation addressing drainage issues posed by railroad tracks, which was dispositive of the preemption issue. Specifically, Section 213.33 of

---

[1] The parties and the Commonwealth Court refer to the governing legislation as the "FRSA." In fact, the Federal Railroad Safety Act of 1970, 45 U.S.C. 431, *et seq.*, was repealed and substantially reenacted in 1994 by Public Law 103-272, § 7(b), 108 Stat. 745, 1379 (1994) ("An Act to revise, codify, and enact without substantive change certain general and permanent laws, related to transportation, as subtitles II, III, and V–X of title 49, United States Code, 'Transportation', and to make other technical improvements in the Code."). The provisions relevant here, 49 U.S.C. §§ 20101-20167, derive from the 1994 Act as amended, which contains no short title such as "FRSA." Nevertheless, for purposes of this Opinion, we will adopt the parties' convention and refer to the governing legislation as the FRSA.

the "Track Safety Standards" regulations states: "Each drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned." 49 C.F.R. § 213.33. In the majority's view, the regulation required SEPTA to "accommodate expected water flow for the area concerned" lying "under . . . the roadbed," *i.e.*, water must be allowed to flow under a bridge without obstruction. That stated, the court held that appellants' common law action was preempted by the FRSA because its subject matter, the duty to maintain a water course "under . . . the roadbed" and "kept free of obstruction," was the subject of Section 213.33. 65 A.3d at 1014.

The court further reasoned that while the FRSA's saving clause, 49 U.S.C. § 20106(a)(2)(A)-(C), allows states to impose stricter regulations than those in the FRSA, the saving clause only saves state law from preemption in limited circumstances which were not met here. Specifically, a state may impose stricter standards only when such regulation: "(A) is necessary to eliminate or reduce an essentially local safety or security hazard; (B) is not incompatible with a law, regulation, or order of the United States Government; and (C) does not unreasonably burden interstate commerce." Id. Here, the court found, first, that the common law of negligence was statewide in scope, not addressing a local hazard. Second, the maintenance of a railroad bridge "to accommodate expected water flow" was a subject occupied by Section 213.33, leaving no place for state regulation. And finally, complying with the common law of fifty states on the matter of railroad bed drainage would burden interstate commerce. Thus the Commonwealth Court majority concluded that the trial court did not err in granting summary judgment in SEPTA's favor. 65 A.3d at 1018.[2]

---

[2] The Commonwealth Court majority noted that SEPTA raised a statute of limitations argument as an alternative theory for affirming the trial court's grant of summary (…continued)

Judges Cohn Jubelirer (joined by President Judge Pellegrini and Judge McCullough) and McCullough (joined by President Judge Pellegrini and Judge Cohn Jubelirer) filed separate dissents. The collective dissenting view emphasized the presumption in favor of state sovereignty with respect to state law causes of action which insists that "the historic police powers of the States [are] not to be superseded . . . unless that [is] the clear and manifest purpose of Congress." Id. (Cohn Jubelirer, J., dissenting, joined by Pellegrini, P.J., & McCullough, J.) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). In the dissenting view, the requisite clear and manifest congressional purpose to preempt has not been expressed. Judge McCullough noted that the purpose of the FRSA is "to promote safety in every area of *railroad operations* and reduce railroad-related accidents and incidents." 65 A.3d at 1022 (McCullough, J., dissenting, joined by Pellegrini, P.J., & Cohn Jubelirer J.) (quoting 49 U.S.C. § 20101). To meet this purpose, the FRSA mandates that the Secretary of Transportation prescribe regulations as needed to address railroad safety. 49 U.S.C. § 20103(a). Here, Judge McCullough observed, the flow of a creek underneath the railroad bridge neither directly nor indirectly impacted railroad safety or railroad operations, particularly because the flooding at issue occurred upstream, and there is no allegation that the flooding encompassed or otherwise affected the railroad tracks on the bridge.

Further, specific to the "Track Safety Standards" regulation at issue, the dissenting view noted that Section 213.33 does not cover the actual subject matter in dispute, *i.e.,* this dispute is not about drainage issues relating to railroad tracks. Section 213.33 relates to man-made drainage systems, not a natural creek which runs beneath

(continued…)
judgment, but declined to address the issue given its disposition on grounds of preemption.

a railroad bridge, or the maintenance thereof. While the "Track Safety Standards" regulations do not define the phrase "water carrying facility," Judge McCullough noted, a preceding section in the same chapter defines "facility" as: "railroad tracks, right-of-way, fixed equipment and facilities, real-property appurtenant thereto, [including] signal systems, passenger station and repair tracks, station buildings, platforms, and adjunct facilities such as water, fuel, steam, electric, and air lines." 49 C.F.R. § 200.3. Additionally, she noted, Black's Law Dictionary defines "facility" as "[s]omething that is built or installed to perform some particular function[.]" BLACK'S LAW DICTIONARY 591 (6th ed. 1990). Neither the regulation itself, nor the referenced definitions encompass a creek or maintenance of a creek bed so as to prevent the accumulation of sediment caused by the railroad bridge's restriction of the creek's flow, which, of course, was the basis of the common law negligence claim at issue.

Finally, the dissenting view maintained, while the regulation expressly governs "roadbed," the term is not defined in the FRSA or the regulations. Even if the regulation at issue applied in this context, Judge Cohn Jubelirer posed, it expressly prescribes only "minimum requirements for roadbed and areas immediately adjacent to roadbed." 49 C.F.R. § 213.31. More importantly, the regulation simply does not relate to bridges. In fact, there are no regulations for "bridges" or "bridge safety" under the FRSA, only an advisory Policy on the Safety of Railroad Bridges. Policy on the Safety of Railroad Bridges, 65 Fed. Reg. 52667–01 (August 30, 2000) (Final Statement of Agency Policy).[3]

_____

[3] To clarify, during all times relevant to the instant matter, there were no bridge safety regulations under the FRSA. As indicated, the Federal Railroad Administration ("FRA") did issue a "Final Statement of Agency Policy" on August 30, 2000, effective September 29, 2000. This advisory policy consisted of non-regulatory guidelines related to bridge inspection and management. "With the policy, [the] FRA established criteria for railroads to use to ensure the structural integrity of bridges that carry railroad tracks," 75 Fed. Reg. 41282-01, but again, this policy was merely advisory in nature. In 2008, however, President George W. Bush signed the Railroad Safety Improvement Act of (…continued)

The Railroad Bridge Policy expressly states that it does not preempt state regulation. In the dissent's view, this express statement, in conjunction with the presumption against preemption, showed there is no clear congressional purpose to preempt the state law at issue here. Neither the policies of the FRSA nor the regulations (which set only minimum standards) conflict with existing riparian rights or other state law.

While the Commonwealth Court issued its sharply-divided decision on March 7, 2013, holding that the FRSA preempts state law in this matter because the maintenance of a railroad bridge to accommodate expected water flow is a subject occupied by Section 213.33, leaving no place for state regulation, the U.S. Court of Appeals for the Third Circuit decided otherwise the very next month, on April 30, 2013. In MD Mall Associates, LLC v. CSX Transportation, Inc., 715 F.3d 479 (3d Cir. 2013), cert. denied, 134 S.Ct. 905 (Jan. 13, 2014), a case concerning flood damage caused by storm-water drainage from the roadbed of certain railroad tracks, occasioned by the failure of man-made drainage facilities, the court concluded:

---

(continued…)
2008, Public Law 110-432, Division A, into law, directing the FRA to issue regulations mandating specific bridge safety procedures. The FRA's final rule in this regard was issued on July 15, 2010, effective September 13, 2010, requiring "track owners to implement bridge management programs, which include annual inspections of railroad bridges. . . ." 75 Fed. Reg. 41282-01. These recently implemented "Bridge Safety Standards," found at 49 C.F.R. §§ 237.1-237.155, appear to be concerned with ensuring the structural integrity of bridges to the end of avoiding "[t]rain accidents caused by the structural failure of railroad bridges" that carry railroad tracks. 75 Fed. Reg. 41282-01. The Bridge Safety Standards do not appear to address any effect that railroad bridges might have upon local tributaries or the like, nor the causation of upstream flooding due to issues which have no bearing on structural integrity or railroad safety. In any event, the preemptive effect of the relatively recent Bridge Safety Standards is not an issue in this matter because this action, which was filed in 2003 for damages caused before that time, substantially predates the 2010 effective date of the FRA's bridge safety regulations.

> We cannot read the silence of § 213.33 on a railroad's duties to its neighbors when addressing track drainage as an express abrogation of state storm water trespass law. Given that the FRSA provides no express authorization for disposing of drainage onto an adjoining property, the presumption must be that state laws regulating such action survive . . . .
>
> [Further,] the type of harm sought to be avoided by § 213.33 is wholly different than the harm alleged by MD Mall.
>
> . . . .
>
> Section 213.33 is . . . plainly intended to prevent water from pooling on or around railroad tracks and thus to avoid potentially dangerous conditions occasioned by standing water, such as the presence of debris on tracks, icing conditions, and compromised track integrity. There is no indication whatsoever that it was intended to address storm water discharge onto a neighboring property, which is the harm alleged by MD Mall. . . . It is accordingly difficult to conclude that § 213.33 "was ... intended to prevent the harm plaintiff suffered," *i.e.*, storm water trespass, or "that the defendant railroad's duty of care" with respect to state storm water trespass law was "subsumed by the regulation."

MD Mall Associates, 715 F.3d at 491-93 (some citations omitted). The U.S. Supreme Court denied *certiorari*. Thus, the published opinions of the U.S. Court of Appeals for the Third Circuit and the Commonwealth Court, respectively, are clearly at odds with one another concerning the preemptive effect of the FRSA as extended by Section 213.33 vis-à-vis Pennsylvania law.[4]

---

[4] The MD Mall court addressed two separate preemption issues: (1) express preemption -- whether the FRSA's express preemption provision operated to extinguish MD Mall's state claims in trespass seeking damages for personal injury, death, or property damage; and (2) implied conflict preemption -- whether MD Mall's "lawsuit may be pre-empted by implication because the state-law principle it seeks to vindicate would conflict with federal law." MD Mall, 715 F.3d at 495 (quotation marks and citation omitted). While the court in MD Mall held that Section 213.33 is not an express abrogation of state storm-water trespass law, the court remanded the matter for a determination (…continued)

The resulting dilemma for a Pennsylvania plaintiff suing a Pennsylvania rail-service provider such as SEPTA concerning railroad-related flood damage is that his claims may be unwelcomed in federal court for failure to raise a federal question, while at the same rejected in state court as being preempted by federal law. Therefore, this Court must determine whether the law of this Commonwealth will remain at odds with federal law on this issue of whether such Pennsylvania law claims are in fact expressly preempted by federal law. As we have noted in the past, while this Court is not bound by decisions of the federal Courts of Appeals, we may, and at times do, look to them for guidance. Commonwealth v. Cook, 952 A.2d 594, 608 n.12 (Pa. 2008). This may be especially appropriate where, as here, the issue concerns the scope and preemptive effect of federal statutes and regulations, which may implicate a special expertise in our federal judicial brethren.

The issue as presented by appellants is plainly stated:

> Did the Commonwealth Court's decision conflict with decisions of the Pennsylvania Supreme Court and the United States Supreme Court where it affirmed the lower court's order granting [appellee] SEPTA's Motion for Summary Judgment on the basis that Congress intended to preempt state law claims of negligent railroad bridge construction and interference with riparian rights when it enacted the Federal Railroad Safety Act?

---

(continued…)
concerning conflict preemption, concluding that the question of whether the railroad might employ reasonable means to comply with Section 213.33 while also complying with the state law at issue presented a question of fact best determined by the lower court. MD Mall, 715 F.3d at 495-96. Because SEPTA's argument here is limited to express preemption, we do not address the issue of conflict preemption.

This is a purely legal issue, involving the proper construction of federal law, and thus our review is plenary and non-deferential. Commonwealth v. Millner, 888 A.2d 680, 686 (Pa. 2005).

Appellants argue that the Commonwealth Court erred because the FRSA and regulations issued thereunder do not preempt Pennsylvania's common law landowner remedies as against the owner of a downstream bridge which acts as a dam, causing flooding to the property of the upper landowner. Appellants note that Section 213.33 is found in Part 213 of Title 49 of the Code of Federal Regulations, which pertains to minimum track safety standards, and provides only that drainage facilities and other water carrying facilities adjacent to or under the roadbed shall be kept free of obstruction to accommodate expected water flow. Appellants naturally highlight the recent holding in MD Mall that Section 213.33 is not addressed to the protection of neighboring property from flooding caused by a railroad facility, and therefore, it does not result in the preemption of Pennsylvania common law concerning the duty not to cause flooding on neighboring property. Appellants posit that, although the federal decision is not binding here, it certainly is instructive.

Under the teaching of MD Mall, appellants argue, it is assumed that a federal statute does not supplant state law unless the congressional intention to do so is clear and manifest; and where an express preemption clause has more than one plausible reading, courts accept the one that disfavors preemption. Thus federal law does not preempt state regulation when the state-regulated activity is merely a peripheral concern of federal law. Applying these principles, appellants maintain, MD Mall makes it clear that the state law claims at issue in this case are not expressly preempted. Further, the state law claims are not subject to field preemption because, as the court held in MD Mall, Congress has not legislated to occupy the entire field. And, lastly,

there is no implied conflict preemption because compliance with both Pennsylvania law and Section 213.33 is not impossible. While many federal regulations address safety of trains and track, none address protection of neighboring landowners or purport to set standards for allowable flooding. On the other hand, Pennsylvania law does address such issues. Finally, appellants argue that a stream is not a water carrying facility as defined in the relevant regulations, and no case law says otherwise. For these reasons, appellants contend that the Commonwealth Court's decision should be reversed.

SEPTA contends that the Commonwealth Court properly affirmed the order of summary judgment in its favor because prior controlling case law establishing the standards for preemption clearly require a finding of express preemption here. In SEPTA's view, there is no conflict between the decision below and controlling prior case law because "the preemptive effect of Section 213.33" upon a state common law riparian rights claim for flood damage has never been addressed by either this Court or the U.S. Supreme Court. Appellee's Brief at 26. Both courts have, however, addressed other preemption issues, developing standards that SEPTA believes were correctly followed below. Thus, under CSX Transportation, Inc. v. Easterwood, 507 U.S. 658, 664 (1993), SEPTA says, appellants' claims are expressly preempted by the FRSA and Section 213.33 because Section 213.33 covers or "substantially subsume[s]" the subject matter of appellants' claims. SEPTA reads Easterwood as specifically instructing "that courts are not to look at the purpose of a FRSA regulation when determining whether it preempts state law"; rather, the determination is simply one of whether regulations have been adopted that cover the subject matter. Appellee's Brief at 12.

While requesting modification of the issue presented to address "state law claims of negligent railroad bridge inspection and maintenance," as opposed to claims of

negligent railroad bridge "construction," since SEPTA had no role in the original design or construction of the bridge at issue, SEPTA insists that the gravamen of appellants' claim is improper maintenance and inspection regarding drainage and potential obstructions under and adjacent to the bridge which allegedly caused the flooding.[5] SEPTA insists that this claim is specifically covered by Section 213.33, which is entitled "Drainage." SEPTA notes that the Track Safety Standards as a whole cover and regulate every aspect of track roadbed maintenance and inspection; in its view, Part 213 covers every area of track roadbed design, construction, maintenance and inspection. The drainage and maintenance requirements of the regulation -- keeping drainage and other water carrying facilities free of obstruction -- necessarily involve the prevention of flooding. Thus, SEPTA argues, railway safety relative to improper drainage under and on property around the railroad roadbed is thoroughly covered by the FRSA and Section 213.33. SEPTA further posits that Easterwood and its progeny were all decided with an eye toward the congressional goal of nationally uniform railroad regulation, and allowing riparian rights claims against rail service providers conflicts with this goal. SEPTA contends that juries cannot be allowed to determine the standards for maintenance and inspection of tracks and roadbed. SEPTA goes so far as to claim that

---

[5] We decline the invitation to modify appellants' issue presented to account for any possible discrepancy in characterizing the cause of action as one for negligent construction as opposed to negligent maintenance, as we deem the distinction between construction and maintenance to be inconsequential for purposes of our preemption analysis. The extent to which that distinction may become relevant in the lower courts for some other purpose is a matter that we will leave for resolution by the lower courts and this Court if and when necessary. Notably, however, appellants have long maintained that the bridge at issue "was defectively designed, built and maintained such that it acted as a dam creating a 'choke point' which failed to allow for a sufficient lateral flow of water." Plaintiffs' Memorandum of Law Contra Defendant [SEPTA's] Motion for Summary Judgment, at 2.

the fact that Pennsylvania plaintiffs may be left with no remedy under its view of the matter is inconsequential.

SEPTA next notes that the Federal Railroad Administration ("FRA") has a track and rail compliance manual that addresses Section 213.33, detailing requirements and identifying what inspectors are to examine. The manual calls for inspection of "Drainage facilities (bridges, trestles or culverts)," and states drainage openings must be inspected for accumulated debris to the extent that expected water flow cannot be accommodated. In SEPTA's view, this manual demonstrates that bridges are drainage facilities, and that inspection of the same is to be included among federally mandated inspections, which further establishes that Section 213.33 covers the same subject as appellants' claims. Additionally, the FRA's Bridge Safety Standards also address various issues relating to the structural integrity of railroad bridges, including inspections following floods, further evidencing the goal of nationally uniform and comprehensive railroad safety regulation.

Finally, SEPTA emphasizes that MD Mall is not binding in Pennsylvania state court, and argues that the panel majority in that case misapplied and ignored the established standards and instructions set forth in Easterwood, which this Court must follow, by examining the purposes behind Section 213.33. In SEPTA's view, the MD Mall court erroneously compared the type of harm sought to be avoided by Section 213.33 and the harm the plaintiff alleged, and wrongly based its decision on the regulation's silence on railroad duties to neighbors. SEPTA argues that this approach is in direct contravention of Easterwood; thus, MD Mall should not be regarded as persuasive. Drainage onto neighboring property is clearly implicit in Section 213.33, SEPTA reiterates; it would be illogical to assert that the regulation only covers the tracks themselves, since overflowing water would eventually go onto neighboring property.

SEPTA, therefore, contends that the order of the Commonwealth Court should be affirmed.[6]

This appeal has been well-briefed, and after due deliberation, we must reject SEPTA's core contentions. We view the case, in its essence, as implicating concerns of federalism. Generally speaking, the federal government exists by reason of agreement by and among the states of this land to be united by a centralized, and yet limited, federal government. Pursuant to that agreement "the People of the United States, in Order to form a more perfect Union . . ." ordained and established the U.S. Constitution. U.S. CONST. pmbl. Therein, the people established that "Th[e] Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State **to the Contrary** notwithstanding." U.S. CONST. art. VI cl. 2 (the "Supremacy Clause")

---

[6] The Pennsylvania Public Transportation Association, the American Public Transportation Association, the Association of American Railroads and the American Short Line and Regional Railroad Association have filed *amicus curiae* briefs in support of SEPTA. In the aggregate, these associations argue that Section 213.33 preempts the claims at issue because the claims pertain to damage caused by the obstruction of a creek by a railroad bridge, while Section 213.33 required SEPTA to maintain the bridge in a manner to accommodate, not obstruct, the expected flow of watercourses. Thus, *amici* say, the regulation addresses the same conduct as the Pennsylvania common law principles at issue and, as a result, appellants' claims are preempted under Easterwood. The associations challenge the U.S. Court of Appeals' decision in MD Mall, claiming that the rule articulated therein calls for a harm-based approach which is at odds with Easterwood, and will result in a morass of confusion and uncertainty in railroad regulation. *Amici* further claim that overturning the decision below will subject public rail service providers to monstrous tort liabilities and massive costs while jeopardizing the continuation of public rail transportation as we know it. Finally, they call for maintenance of a uniform national policy with federal regulations establishing the applicable standard of care, rather than state-based standards established by what they denigrate as ill-equipped and unqualified juries, which will force service providers into inefficient use of limited funding as they react to shifting jury perceptions.

(emphasis added). What is understood then, is that the laws of any State (or Commonwealth as the case may be) which are **not** contrary to the "supreme Law of the Land" retain full force and effect because the allocation of powers in our federal system is designed to preserve "the integrity, dignity, and **residual sovereignty** of the States[,]" not to abrogate or abolish them. Bond v. U.S., 131 S.Ct. 2355, 2364 (2011) (emphasis added). Put differently, "the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." Gregory v. Ashcroft, 501 U.S. 452, 461 (1991).

To that end, the Tenth Amendment to the U.S. Constitution states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Notably, the U.S. Supreme Court has recognized that the Tenth Amendment's restraint on congressional authority is not derived from the amendment itself, but the amendment merely confirms the state sovereignty that predates it, and indeed, the state sovereignty that predates the federal government itself. New York v. U.S., 505 U.S. 144, 156-57 (1992). The founding fathers' vision of these "united states," was never a system in which the federal government would replace and do away with state government. The predominant theory underlying our federalist system has always been to secure the rights of the people, striking a proper balance between state and federal governments to promote "double security," for individual freedom, while allowing local policies that are sensitive to the varying needs of a heterogeneous union. Gregory, 501 U.S. at 458-59; see also Bond, 131 S.Ct. at 2364. Federalism continues to allow state responsiveness to those who seek a voice in relatively local government issues without reliance upon politics controlling the remote central government. Bond. As James Madison explained it:

> If angels were to govern men, neither external nor internal controls on government would be necessary. In framing a

government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself. . . .

. . . .

. . . In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people. The different governments will control each other, at the same time that each will be controlled by itself.

The Federalist No. 51, p. 322-23 (C. Rossiter ed. 1961).

While the theoretical goal is to maintain a constitutional balance between federal and state powers, it is true that the federal government has a limited, yet substantial, precedence by virtue of the Supremacy Clause. "As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States. Congress may legislate in areas traditionally regulated by the States." Gregory, 501 U.S. at 460. Because this is an "extraordinary" power within the context of a federalist system, it is assumed that Congress does not exercise such power lightly. Id. The appropriate effects of this assumption are readily seen in preemption jurisprudence. The High Court, with an eye toward the proper balance in our federal structure, has taught:

If Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute. . . . Congress should make its intention clear and manifest if it intends to pre-empt the historic powers of the States. . . . [T]he requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision. . . . This plain statement rule is nothing more than an acknowledgment that the States retain

substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere.

Gregory, 501 U.S. at 460-61 (citations and quotation marks omitted). Thus, the High Court has held: "'it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides' this balance." Id. at 460 (quoting Atascadero State Hospital v. Scanlon, 473 U.S. 234, 243 (1985)).

In Wyeth v. Levine, 555 U.S. 555, 565 (2009), the High Court further explained that "the purpose of Congress is the ultimate touchstone in every pre-emption case"; therefore, in such cases, the federal courts "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." The federal courts rely on this presumption "because respect for the States as independent sovereigns in our federal system leads [the High Court] to assume that Congress does not cavalierly pre-empt state-law causes of action." Id. at 565 n.3.

Similarly, given that this Court's powers are derived from the citizens of Pennsylvania, we do not lightly set aside their existing rights or remedies in deference to uncertain federal law, particularly where doing so would leave Pennsylvania citizens without any remedy at all in an area where a remedy otherwise might obtain. Thus, independent of the teaching of the High Court, there is good reason for this Court to be certain of federal congressional intent before allowing federal law to divest Pennsylvanians of the rights and remedies afforded under the laws of this Commonwealth. Thus, this Court has held: "concepts of federalism and state sovereignty make clear that in discerning whether Congress intended to preempt state law, there is a presumption against preemption[,]" as we also require a clear manifestation of congressional intent to preempt. Dooner v. DiDonato, 971 A.2d 1187,

1194 (Pa. 2009). We have emphasized that, even where federal law contains an express preemption clause, our duty is to further inquire as to the scope and substance of any displacement of our state laws. Id. at 1193. As a final point of framing background, and as stated earlier, we recognize that we are not bound by the lower federal courts' decisions as to the preemption issue before us, but may look to them for guidance. After conducting an independent analysis considering the facts before this Court, however, we agree with the view of the U.S. Court of Appeals for the Third Circuit concerning the preemptive effect of the FRSA as extended by Section 213.33.

We hold that the instant state law riparian rights claim is neither covered by the FRSA's preemption provision, nor Section 213.33 of the federal Track Safety Standards regulations. In the first place, as noted, "[t]he purpose of [the FRSA] is to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. To that end, Congress provided that "[l]aws, regulations, and orders **related to railroad safety** . . . shall be nationally uniform to the extent practicable." Id. § 20106(a)(1) (emphasis added). In order to accomplish such uniformity, while simultaneously respecting state sovereignty, Congress promulgated an express preemption provision to delineate where state railroad safety laws would remain in effect, and where federal regulation would control instead. Congress provided:

> A State may adopt or continue in force a law, regulation, or order **related to railroad safety** . . . until the Secretary of Transportation (with respect to railroad safety matters) . . . prescribes a regulation or issues an order covering the subject matter of the State requirement. . . .

Id. § 20106(a)(2) (emphasis added).

The above language is a clear statement of preemption, but as to a very narrowly defined area. Thus, this Court has held that this express preemption provision

pertaining to "[l]aws, regulations, and orders related to railroad safety" only applies if, first of all, "the Executive Branch has taken an action that 'cover[s] the subject matter' of the state enactment"; and if, secondarily, "the state enactment fails to satisfy all three requirements enumerated in Section 106 of the Act[,]" *i.e.*, if the state law is (a) necessary to reduce an essentially local safety hazard, (b) is not incompatible with laws of the U.S., and (c) does not unreasonably burden interstate commerce. Krentz v. Consolidated Rail Corp., 910 A.2d 20, 32 (Pa. 2006). This Court further clarified that in order "[t]o prevail on the claim that regulations have pre-emptive effect, the party advocating preemption must establish more than that they 'touch upon' or 'relate to' that subject matter, for 'covering' is a more restrictive term which indicates that pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." Id. at 33 (quoting Easterwood, 507 U.S. at 664-65).

The instant lawsuit does not pertain to any state railroad safety law, but pertains instead to riparian rights under Pennsylvania's common law, a field which Pennsylvania has traditionally occupied, as other states have, vis-à-vis the riparian rights afforded therein. Appellants reference case law from this Court dating as early as 1855. See Mertz v. Dorney, 25 Pa. 519, 520 (Pa. 1855) ("If therefore the plaintiff's land was flooded by means of the repairs to the dam to a greater extent than it had been for a period of twenty-one years, the defendant was liable for the injury."). In 1962, this Court summarized Pennsylvania law in the area as follows:

> The law is well settled that the owner of land through or over which a natural watercourse flows may not obstruct the stream so as to damage the land higher up on the stream. One buys land as it is and he knows that rivers, creeks and tributaries are destined by natural laws to move toward larger bodies of water. There is in each moving stream an irresistible force which cannot be stopped or harnessed without in some way affecting the land which it touches. Thus, the owner of land on the higher level of a

stream has the right to have that stream move away from him and every subservient owner has the obligation to let it continue on its way. . . .

. . . The lower owner has no right to obstruct the flow of the stream by a dam so as to flood the land of the upper owner, or to raise the level of the water in its bed to his detriment.

What the subservient owner may not do through intention he may equally not accomplish through neglect.

Helms v. Zeitzeff, 181 A.2d 277, 278-79 (Pa. 1962) (citations and quotations omitted). These principles of Pennsylvania common law have no direct or significant relation to railroad safety. Moreover, these riparian rights principles fall within the historic police powers of Pennsylvania, and are not to be superseded by a federal act unless superseding these common law principles is the clear and manifest purpose of Congress. Given the clear congressional emphasis within the FRSA on relation to railroad safety, we perceive no clear or manifest congressional purpose to supersede Pennsylvania law as pertaining to riparian rights, particularly because the Pennsylvania law invoked by appellants has no apparent relation to railroad safety. We hold, therefore, that Pennsylvania common law governing riparian rights is not preempted by the FRSA, as such common law lies outside of the scope of the FRSA.

Alternatively, even were we to conclude otherwise, we note that the task would still require interpretation, as we would be left to apply the FRSA's express preemption provision. And in doing so, we would conclude that the Commonwealth Court majority erred in holding that Pennsylvania riparian rights common law is preempted by the FRSA under that preemption provision.[7] In our respectful view, the Commonwealth

_____

[7] By way of "[c]larification regarding State law causes of action," as related to the FRSA's express preemption provision, 49 U.S.C. § 20106(b)(1) now provides, in part, "Nothing in this section shall be construed to preempt an action under State law seeking (…continued)

Court majority's holding that Section 213.33 of the Track Safety Standards is dispositive of preemption as a regulation which covers the subject matter of the governing state law, the court was plainly incorrect. Section 213.33 simply does not address, much less cover, the subject matter of Pennsylvania's common law riparian rights.

To begin with, Part 213 is identified specifically as setting forth "Track Safety Standards." The scope of that part is expressly limited to "minimum safety requirements **for railroad track**," and "[i]n general, the requirements prescribed in this part apply to **specific track conditions**. . . ." 49 C.F.R. § 213.1 (emphases added). Moreover, Section 213.33 falls within Subpart B to the Track Safety Standards, which is expressly limited in scope to "minimum requirements for **roadbed** and areas immediately adjacent to **roadbed**." 49 C.F.R. § 213.31 (emphases added). Notably, the provision identified by the Commonwealth Court majority as dispositive here, Section 213.33, pertains specifically to "Drainage." It provides: "Each drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow **for the area concerned**." (emphasis added). Given the plainly limited scope of the Track Safety Standards, including Section 213.33, and the further limited scope of the Roadbed subpart, it is clear that the

_____

(continued…)
damages for [*inter alia*] property damage alleging that a party . . . (C) has failed to comply with a State law . . . that is not incompatible with subsection (a)(2)." Because the state law at issue does not relate to railroad safety, we conclude that it is not incompatible with subsection (a)(2), and therefore, according to the preemption provision, Section 20106 should not be construed to preempt the present action. We recognize, however, that Section 20106(b)'s clarification expressly applies to causes of action arising on or after January 18, 2002, while the events underlying this action occurred before then. Thus, we do not rely upon Section 20106(b) in resolving the issue presented herein, but do note that this "clarification" is telling as a counterpoint to the arguments of SEPTA and *amici* regarding supposed congressional intentions vis-à-vis Section 20106(a).

"area concerned," specifically for safety purposes, is the railroad track and the track's roadbed. Under Section 213.33, expected water flow (presumably primarily storm-water flow) upon the track and roadbed must be accommodated by drainage or other water carrying facilities, quite obviously to prevent the track safety issue which would otherwise be presented by the accumulation of standing water on railroad tracks, and corresponding interference with railroad operations. To be sure, attention to the tracks, drainage, and obstructions may inure to the benefit of neighboring landowners. But the concerns addressed have no express relation to the riparian **rights** at issue in this case.

To the extent that SEPTA argues that this case falls within the purview of Section 213.33 because the bridge at issue was a "drainage or other water carrying facility," we are unconvinced because this case does not concern allegations of upstream damages to a neighbor resulting from drainage from the track roadbed upon SEPTA's bridge; the claim arises from an allegation involving the obstruction of a creek and resulting upstream flooding. There has been no suggestion that the creek at issue had ever risen, or could ever have risen to the height of the roadbed upon SEPTA's bridge, thereby creating an actual track safety issue. Therefore, whether or not the bridge constituted a drainage facility by definition does not bear upon the issue of whether Section 213.33 covers and thereby effectively displaces the subject matter of Pennsylvania's common law riparian rights; it does not.

Finally, as concerning SEPTA's argument that Easterwood instructed that courts are not to look upon the purpose of a FRSA regulation when determining whether it preempts state law, SEPTA stretches Easterwood's holding beyond the High Court's intention (while SEPTA and its *amici* themselves include argument respecting supposed congressional purposes). Easterwood's holding is clear that the preemption determination under the FRSA is one of whether regulations have been adopted

(pursuant to the governing statute) that cover the subject matter of the allegations which may be assumed to state a valid cause of action. Notably, consistent with the federalism principles addressed above, the High Court stated:

> In the interest of avoiding unintended encroachment on the authority of the States . . . a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption. Thus, pre-emption will not lie unless it is 'the clear and manifest purpose of Congress.' . . . Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue. . . . If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.

Easterwood, 507 U.S. at 663-64 (citations omitted). The High Court did state that the prior governing statute, 45 U.S.C. § 434, "does not . . . call for an inquiry into the Secretary's purposes, but instead directs the courts to determine whether regulations have been adopted that in fact cover the subject matter . . . ." Easterwood, 507 U.S. at 675.[8] We do not read that observation, however, as a mandate to ignore congressional

---

[8] We note that the prior governing statute, 45 U.S.C. § 434, was substantially the same as the statute at issue herein, 49 U.S.C. § 20106(a). Under the heading "National uniformity of laws, rules, regulations, orders, and standards relating to railroad safety; State regulation," the prior statute read:

> The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible

(…continued)

and regulatory purpose when engaged in a plain language interpretation of the operative language in the course of determining whether a regulation covers the subject matter at issue. When interpreting otherwise undefined regulatory terms such as "drainage or other water carrying facility," "roadbed" and "area concerned," to determine whether Section 213.33 covers causing a back-up of creek-water at a remote upstream location, in determining the meaning and import of those terms and phrases, it is appropriate to consider the context of the regulation, as well as whether the terms and phrases utilized therein were intended to cover the subject matter. Easterwood simply does not counsel otherwise.[9]

In conclusion, we hold that the FRSA does not preempt the state law riparian rights claim at issue in this case because the matter is entirely unrelated to railroad safety. We further hold that Section 213.33 of the federal Track Safety Standards regulations does not cover the subject matter at issue herein. Similar to the U.S. Court of Appeals for the Third Circuit's holding in MD Mall, we likewise conclude that Section 213.33 does not extend the FRSA to abrogate Pennsylvania law as it pertains to potential railroad liability for flood damages to neighbors allegedly caused by the railroad.

---

(continued…)
>    with any Federal law, rule, regulation, order, or standard,
>    and when not creating an undue burden on interstate
>    commerce.

[9] Moreover, if the Third Circuit's interpretation was both erroneous and a deviation from Easterwood, the Court with the corrective power and obligation is the U.S. Supreme Court, which declined review. It would be a strange circumstance indeed for this Court to act to extinguish state law remedies in a federal Circuit where the controlling federal law sees no basis for such a displacement.

Order reversed and remanded to the Commonwealth Court for proceedings consistent with this Opinion.

Jurisdiction is relinquished.

Former Justice McCaffery did not participate in the decision of this case.

Messrs. Justice Saylor and Baer, Madame Justice Todd and Mr. Justice Stevens join the opinion.

Mr. Justice Eakin files a dissenting opinion.